(943 P.2d 470)
No. 78,637

FARMLAND INDUSTRIES, INC., BOARD OF COMMISSIONERS OF JEFFERSON COUNTY, KANSAS, KANSAS PIPELINE PARTNERSHIP, BOEING COMPANY, GENERAL MOTORS CORPORATION, VULCAN MATERIAL, INC., CEREAL FOOD PROCESSORS, INC., and HEARTLAND CEMENT COMPANY, *Appellants,* v. THE STATE CORPORATION COMMISSION OF KANSAS, *Appellee.*

WESTERN RESOURCES, INC., KANSAS GAS AND ELECTRIC COMPANY, CITIZENS' UTILITY RATEPAYER BOARD, and CITY OF WICHITA, *Intervenors.*

Opinion filed August 1, 1997.

*James P. Zakoura* and *David J. Roberts*, of Smithyman & Zakoura, Chartered, of Overland Park, and *Edmund S. Gross*, of Farmland Industries, Inc., of Kansas City, Missouri, for appellant Farmland Industries, Inc.

*Daniel D. Owen,* of Shughart Thomson & Kilroy, P.C., of Overland Park, for appellant Board of Commissioners of Jefferson County.

*Fred J. Logan, Jr.,* of Logan & Logan, of Prairie Village, for appellant Kansas Pipeline Partnership.

*Robert C. Johnson* and *Diana M. Schmidt,* of Peper, Martin, Jensen, Maichel and Hetlage, of St. Louis, Missouri, and *Robert Van Cleave,* of Gates & Clyde, Chartered, of Overland Park, for appellants Boeing Company, General Motors Corporation, Vulcan Material, Inc., Cereal Food Processors, Inc., and Heartland Cement Company.

*Larry M. Cowger, John J. McNish,* and *Janette W. Corazzin,* of the Kansas Corporation Commission, for appellee.

*J. Michael Peters* and *Martin J. Bregman,* of Western Resources, Inc., and Kansas Gas and Electric Company, of Topeka, *John D. Petersen* and *Frank A. Caro, Jr.,* of Polsinelli, White, Vardeman & Shalton, a Professional Corporation, of Overland Park, and *Mike Lennen,* of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, for intervenors Western Resources, Inc., and Kansas Gas and Electric Company.

*Walker Hendrix,* of Citizens' Utility Ratepayer Board, of Topeka, for intervenor Citizens' Utility Ratepayer Board.

*Gregg D. Ottinger,* of Duncan & Allen, of Washington, D.C., *Gary E. Rebenstorf,* city attorney, and *Joe Allen Lang,* first assistant city attorney, for intervenor City of Wichita.

Before GREEN, P.J., ELLIOTT, J., and WAHL, S.J.

GREEN, J.: This case involves a number of challenges to the Kansas Corporation Commission's (KCC) approval of two nonunanimous settlement agreements setting revenue requirements and rate design charges for electricity of two public utilities. The two utilities, Kansas Gas and Electric Company (KGE) and Kansas Power and Light Company (KPL), are owned by Western Resources, Inc. (WRI). Nevertheless, the utilities exist as separate entities for tax and rate-making purposes. Seeking judicial review of the order approving these settlements, Farmland Industries, Inc. (Farmland), Kansas Pipeline Partnership (KPP), Kansas Industrial Consumers (KIC), and the Board of Commissioners of Jefferson County (Jefferson County) all filed petitions for review. The appellants challenge the sufficiency of the evidence supporting

KCC's order and allege that the notice furnished to KGE and KPL customers was inadequate.

Farmland is a commercial customer that uses between $12 and $15 million worth of electricity annually. KPP is a natural gas utility that has been deeply involved in promoting competitive energy markets in Kansas. KIC is a group of large consumers of electricity and gas in the state of Kansas, which includes Boeing Company, General Motors Corporation, Vulcan Material, Inc., Cereal Food Processors, Inc., and Heartland Cement Company. Jefferson County has a significant number of KPL residential customers living within its boundaries.

The intervenors were WRI; the Citizens' Utility Ratepayer Board (CURB), a state agency created to represent residential and small commercial ratepayers in proceedings to regulate public utilities; and the City of Wichita, a party that pays a $12 million-a-year electric bill to KGE and that is concerned with the difference between the higher rates of KGE and the lower rates of KPL.

In August 1995, WRI, on behalf of KGE, KPL, and WRI's natural gas division, filed three applications with KCC. WRI proposed an integrated rate plan that would take effect at the same time in all three cases. As a result of changes in depreciation and proposed increases in natural gas rates, WRI proposed rate reductions for KGE customers of $8.7 million a year for 7 years and no change in KPL rates for 7 years. In December 1995, KCC scheduled public hearings and directed KPL and KGE to furnish notice to customers of the applications and hearings. Although WRI's original three applications were consolidated on November 1, 1995, KCC later directed that the natural gas proceeding be handled separately.

On May 22, 1996, WRI moved to amend its applications in support of its present rates, requesting permission to file its own cost-of-service studies. On June 14, 1996, KCC granted WRI's request to amend its application to allow filing of cost-of-service information and restarted the 240-day time period of K.S.A. 1996 Supp. 66-117(b), effective May 22, 1996. The amended application changed the proceedings into a traditional cost-of-service rate case

for KGE and KPL. No additional notice was sent to KPL and KGE customers about changes in the nature of the proceedings.

On August 9, 1996, WRI, KCC staff (Staff), CURB, and the City of Wichita asked KCC to approve a nonunanimous settlement agreement resolving the amount of money the utilities would be allowed to collect in rates and how this amount would be spread among KGE and KPL customers. During the hearings for approval of the settlement, Gary C. Harpster, a KPP witness, testified that Staff had made an error in analyzing WRI's cost of service. As a result, Staff increased the amount it contended KGE was over-earning by $32 million. Based on the possible impact of this error on the settlement negotiations, KCC rejected the settlement agreement.

After an amended settlement was submitted, KCC conditionally approved it and set hearings to begin on November 5, 1996. Following the hearings, KCC orally approved the amended settlement agreement. After KCC approved the amended settlement agreement, Staff and WRI submitted a proposal on rate design. At the same time, Farmland, KIC, and CURB submitted the customers' proposal on rate design. KCC adopted Staff and WRI's proposal and rejected the customers' proposal.

*Standard of Review*

Our standard of review is set forth in K.S.A. 77-621, which codifies principles repeatedly recognized by the Kansas courts. See *Kansas Gas & Electric Co. v. Kansas Corporation Comm'n*, 239 Kan. 483, 497, 720 P.2d 1063 (1986); *Midwest Gas Users Ass'n v. Kansas Corporation Commission*, 3 Kan. App. 2d 376, 380-81, 595 P.2d 735, *rev. denied* 226 Kan. 792 (1979). The party asserting the agency action is invalid has the burden of proving its invalidity. K.S.A. 77-621(a)(1).

In *Midwest*, our court stated:

"A court has no power to set aside [a KCC] order unless it finds that the commission acted unlawfully or unreasonably. [Citation omitted.] An order is 'lawful' if it is within the statutory authority of the commission, and if the prescribed statutory and procedural rules are followed in making the order. [Citation omitted.] An order is generally considered 'reasonable' if it is based on substantial competent evidence. [Citation omitted.]

"The legislature has vested the commission with wide discretion and its findings have a presumption of validity on review. [Citation omitted.] Since discretionary authority has been delegated to the commission, not to the courts, the power of review does not give the courts authority to substitute their judgment for that of the commission. [Citation omitted.] The commission's decisions involve the difficult problems of policy, accounting, economics and other special knowledge that go into fixing utility rates. It is aided by a staff of assistants with experience as statisticians, accountants and engineers, while courts have no comparable facilities for making the necessary determinations. [Citation omitted.] Hence a court may not set aside an order of the commission merely on the ground that it would have arrived at a different conclusion had it been the trier of fact. It is only when the commission's determination is so wide of the mark as to be outside the realm of fair debate that the court may nullify it. [Citations omitted.]" 3 Kan. App. 2d at 380-81.

In *Zinke & Trumbo, Ltd. v. Kansas Corporation Comm'n*, 242 Kan. 470, 473-75, 749 P.2d 21 (1988), our Supreme Court noted that after a court considers all the named reasons for vacating an agency order, the legislature provided administrative bodies with an escape clause by requiring in K.S.A. 77-621(d) that courts give "due account" to the harmless error rule. Therefore, if the agency error did not prejudice the parties, the agency's action must be affirmed. Summarizing briefly the scope of appellate review, the court states:

"If KCC action is constitutionally authorized by statute, it is presumed valid on review unless it is not supported by substantial competent evidence and is so wide of its mark as to be outside the realm of fair debate, or is otherwise unreasonable, arbitrary, or capricious and prejudices the parties." 242 Kan. at 475.

With these standards of review in mind, we turn to the substantive issues.

## I. WAS NOTICE TO KGE AND KPL CUSTOMERS PROPER?

Sufficiency of notice is a legal question. Therefore, this court may substitute its judgment for that of the agency. *Crawford v. Kansas Dept. of Human Resources*, 17 Kan. App. 2d 707, 708, 845 P.2d 703, (1989), *rev. denied* 246 Kan. 766 (1990). However, this court gives due deference to the agency's expertise and technical knowledge of the subject it is charged with regulating. See *State Dept. of SRS v. Public Employee Relations Board*, 249 Kan. 163, 166, 815 P.2d 66 (1991).

*A. Was the notice given adequate?*

Although KCC and WRI argue that no notice of the rate-making process was due ratepayers, we will first address the issue of whether the notice given was adequate. If we determine that the notice was adequate, we need not address KCC's and WRI's arguments that no notice was required.

Appellants argue that notice given KGE and KPL customers was inadequate because it did not advise ratepayers of the true nature of the proceeding after it became a traditional cost-of-service rate case. In *Mullane v. Central Hanover Tr. Co.*, 339 U.S. 306, 314, 94 L. Ed 865, 70 S. Ct. 652 (1950), the Court noted that while the fundamental requisite of due process of law is the opportunity to be heard, this right has little reality or worth unless one is informed of the pending matter and can decide whether to participate. The Court discussed the inadequacy of providing notice by publication and the preference for personal service, especially when names and addresses of trust beneficiaries are known and available. 339 U.S. at 317-18. Yet, the Court recognized that interests must be balanced to determine what notice is required in a particular situation. 339 U.S. at 314. "A construction of the Due Process Clause which would place impossible or impractical obstacles in the way [of the State reaching a final decision] could not be justified." 339 U.S. at 313-14. Notice should be more than a mere gesture; it should be reasonably calculated, depending upon the practicalities and peculiarities of the case, to apprise interested parties of the pending action and afford them an opportunity to present their case. 339 U.S. at 314-15.

Here, appellants correctly assert that under the Due Process Clause, the notice used by KCC must inform interested parties of proceedings which may directly or adversely affect legally protected interests. See *Walker v. Hutchinson City*, 352 U.S. 112, 1 L. Ed. 2d 178, 77 S. Ct. 200 (1956). In *Walker*, the City of Hutchinson instituted condemnation proceedings against a landowner, but the only notice given was publication in the official city newspaper. Referring to its decision in *Mullane*, the Court recognized "the impossibility of setting up a rigid formula as to the kind of

notice that must be given; notice required will vary with circumstances and conditions." 352 U.S. at 115. But in *Walker*, no compelling or persuasive reason existed for not giving direct notice, particularly since the City knew the landowner's name and address. 352 U.S. at 116.

Here, KCC ordered notice be given in its order of December 19, 1995, stating:

"10. The Commission directs Applicants to provide notice of the applications and hearings by method of first class mailing to all its customers by mailing the attached notice. Notice shall be received by each customer prior to the public hearings. In addition, the Commission directs Applicants to publish the attached notice of public hearings in newspapers of general circulation in and around Applicant's general service territory."

The notice begins with a description of the application:

"Western Resources has filed an application with the Kansas Corporation Commission requesting a $36 million natural gas rate increase for both KPL and KG&E customers, an electric rate reduction of $61 million over a seven year period at a rate of $8.7 million per year for KG&E electric customers; and to accelerate the depreciation of the Wolf Creek Generating Station."

The notice continues by listing the time and place for four public hearings, inviting written comments, and advising of a scheduled technical hearing. The notice then gives a more detailed discussion of the proposal. It describes WRI's request for an increase of natural gas rates and discusses the proposal for electric rate reductions, stating:

"Western Resources requested permission to reduce electric rates $8.7 million per year in seven annual increments. At the end of seven years the annual reduction would equal $61 million for KG&E customers. The proposed rate reduction would result from a request by Western Resources to accelerate the depreciation of the Wolf Creek Generating Station by $50 million per year for seven years.

"In its application, Western Resources said accelerated depreciation of Wolf Creek and the resulting reduction in electric rates is necessary to be competitive in a changing electric energy market. Under the proposed plan, Western Resources stated electric rates for KPL customers should remain unchanged for the next seven years."

The notice closed by providing a telephone number for more information about the proposal or the public hearings.

In the Kansas Administrative Procedure Act, notice of a formal hearing must be given to all parties and persons who have sought to intervene. K.S.A. 77-518(a). The form of the notice is prescribed by K.S.A. 77-518(c) and must include the name and reference number of the proceeding as well as a general description of the subject matter. K.S.A. 77-518(c)(3). However, the detailed notice of K.S.A. 77-518(c) may be replaced with a brief statement "indicating the subject matter, parties, time, place and nature of the hearing, manner in which copies of the notice to the parties may be inspected and copied and name and telephone number of the presiding officer." K.S.A. 77-518(e).

Under its power to develop reasonable rules and regulations regarding the filing of all schedules of rates by public electric utilities, K.S.A. 1996 Supp. 66-101c, the KCC has promulgated regulations that specify the form of applications in rate cases depending upon the classification of the utility. K.A.R. 82-1-231. KPL and KGE are class A electric utilities. K.A.R. 82-1-204(p)(1)(A). If a class A utility proposes changes in tariffs that "will result in a major increase in its rates or charges" (K.A.R. 82-1-231[b][2]), it must submit an application and schedule conforming with the requirements of K.A.R. 82-1-231(c). Subsection (1) of 82-1-231(c) states: "Each application by a class A utility which proposes a major increase in rates or charges shall be accompanied by schedules which will indicate to the commission the nature and extent of the proposed changes." The form, order, and titles of an application are prescribed by 82-1-231(c)(4), which includes a specific section regarding notice to the public:

"(B) Section 2: General information and publicity. This section shall describe the means generally employed by the utility to acquaint the general public that would be affected by the proposed rate change with the nature and extent of the proposal. This section may include, but is not limited to statements concerning newspaper articles and advertisements, meetings with public officials, civic organizations and citizen groups, and shall include general information concerning the application which will be of interest to the public and suitable for publication."

K.A.R. 82-1-231 continues by specifying information to include in the notice.

KCC and WRI argue that because the proceedings involve a substantial decrease in electric rates, K.A.R. 82-1-231 does not apply since no increase in rates was proposed. This argument is flawed. The statutory authorization giving KCC power to establish and maintain just and reasonable rates is not limited to increasing rates. Instead, the KCC has power to set rates "reasonably necessary . . . to maintain reasonably sufficient and efficient service" from electric public utilities. K.S.A. 1996 Supp. 66-101b. The ability to establish and maintain "efficient" service suggests the legislature anticipated an occasion might arise in which a public utility would be required to reduce rates.

Also, Farmland points out that the phrase "major increase in rates or charges" is a term of art defined in K.A.R. 82-1-231(b)(4). Thus, a "major increase in rates or charges" occurs not only when the charges relate to a general increase in revenue allegedly needed to obtain a fair rate of return, K.A.R. 82-1-231(b)(4)(A), but also when

"(B) material changes in operations, facilities or cost of service occur subsequent to the test year employed in any major rate decision . . .; or

"(C) the proposed changes will, in the opinion of the commission, materially affect the public interest." K.A.R. 82-1-231(b)(4).

It is debatable whether any of the definitions of "major increase in rates or charges" apply to the original applications in this case. No general increase in revenue was requested; no test year was employed. The KCC did not state that in its opinion the proposed changes materially affected the public interest. Yet, KCC set four public hearings "for the purpose of receiving public comments from WRI and KG&E customers with regard to the proposed rate increases and other relief sought shall be held." KCC also specified notice be mailed first class to all KPL and KGE customers and be published "in newspapers of general circulation in and around Applicant's general service territory."

Appellants cite to the Kansas Supreme Court decision in *Suburban Medical Center v. Olathe Community Hosp.*, 226 Kan. 320, 597 P.2d 654 (1979), where the court summarized procedures needed to comply with due process as follows:

"An administrative hearing, particularly where the proceedings are judicial or quasi-judicial, must be fair, or as it is frequently stated, full and fair, fair and adequate, or fair and open. The right to a full hearing includes a reasonable opportunity to know the claims of the opposing party and to meet them. In order that an administrative hearing be fair, there must be adequate notice of the issues, and the issues must be clearly defined. All parties must be apprised of the evidence, so that they may test, explain, or rebut it. They must be given an opportunity to cross-examine witnesses and to present evidence, including rebuttal evidence, and the administrative body must decide on the basis of the evidence." 226 Kan. 320, Syl. ¶ 4.

Appellants assert that the dramatic change in the nature of WRI's applications, from when the applications were initially filed and notice was made until their final resolution a year and a half later, gave customers no opportunity to understand the nature of the new proceeding. Appellants point in particular to WRI's amendment of the application on May 22, 1996, that changed the nature of the proceeding to a more traditional cost-of-service rate hearing. Farmland asked KCC to provide new notice to KPL and KGE customers based upon this change, but it was denied. Appellants argue this violated the requirements of due process.

Regarding notice to KPL and KGE customers, KCC argues that the original notice required in the KCC order of December 19, 1995, adequately advised the customers of WRI's position throughout the proceedings and informed them of the nature of the proceedings. WRI consistently sought to decrease rates for KGE customers and did not request an increase for KPL customers.

Distinguishing this case from *Mullane* and *Walker*, WRI asserts that KGE and KPL electric customers have no property interest in rates charged for electric service similar to the direct property interests of plaintiffs in those two cases. Instead, WRI argues interests of ratepayers in this proceeding are adequately protected by KCC and CURB, both public agencies. We reject this argument. Although both agencies are charged with representing public interests, if notice to ratepayers is required, it cannot be satisfied by notice to a state agency, unless allowed by statute. Further, notice to KCC and CURB cannot act as a substitute for notice reasonably calculated to inform interested parties of proceedings that may affect their legal interests.

To bolster their argument, some appellants mention this court's statement in *Western Resources, Inc. v. Kansas Corporation Comm'n*, 23 Kan. App. 2d 664, 666, 937 P.2d 964 (1997), that "administrative agencies must ensure litigants their day in court. This includes proper notice as a prerequisite to valid agency action." In *Western Resources*, KCC did not advise WRI that consolidation of dockets was for a limited purpose until after the case had been decided and appealed to this court. This court found KCC did not have the power to go back and restructure the entire proceeding at that late date. Consequently, *Western Resources* is easily distinguishable from the present case.

Also, appellants rely upon a decision by the United States Court of Appeals for the Fifth Circuit to support their argument that notice was inadequate. In *North Alabama Exp., Inc. v. U.S.*, 585 F.2d 783 (5th Cir. 1978), the court found that notice published in the Federal Register by a motor common carrier was misleading and was jurisdictionally defective because it failed to give opposing carriers, or members of the public, proper notice and a chance to be heard. The court stated: "In the administrative context, due process requires that interested parties be given a reasonable opportunity to know the claims of adverse parties and an opportunity to meet them." 585 F. 2d at 786. The court held that because adequate notice goes to the very jurisdictional validity of the proceeding, the Interstate Commerce Commission could not rescue the notice by arguing about what one could or did infer from the notice. The court ordered the agency action stayed pending republication in the Federal Register and an opportunity for interested persons to be heard. 585 F.2d at 790 and n.5.

Nevertheless, this proceeding and the notice provided to KPL and KGE customers are easily distinguishable from *North Alabama*. Here, the information furnished by the notice ordered by KCC was not inaccurate. Although the nature of the proceeding changed from a "creative" integrated rate plan involving WRI's two electric divisions and its natural gas division to a traditional cost-of-service rate proceeding for WRI's two electric divisions, the general description of the purpose of the proceeding did not become inaccurate or misleading. The proceeding was initiated to deter-

mine future electric and natural gas rates. The notice told KPL and KGE customers that WRI was seeking a decrease in rates for KGE electric customers, no change in rates for KPL electric customers, and an increase in natural gas rates for KPL and KGE customers. The notice afforded customers who were interested parties notice of the subject matter to be considered and of the opportunity to participate in the hearing. Therefore, we find that the notice furnished to KPL and KGE customers under the KCC order of December 19, 1995, was adequate.

## B. *Was notice to the Secretary of Administration adequate?*

Farmland argues that the notice KCC furnished the Secretary of Administration (Secretary) was inadequate. Under K.S.A. 66-117a, KCC must notify the Secretary of any rate hearing in which the State of Kansas will be affected as a consumer by a proposed change in rates. KCC notified the Secretary on August 22, 1996, by facsimile followed by mail service. The acting Secretary responded on August 26, 1996, informing KCC that he would not intervene. Therefore, any deficiency in providing notice to the Secretary was waived by the Secretary.

WRI and KCC assert that even if notice to the Secretary and KPL and KGE customers was improper, appellants have no standing to complain because all of them, even Jefferson County, had notice. Because this court finds that the notice given was adequate to meet constitutional and statutory requirements, this issue is moot. This court will not address issues that are moot. See *Shanks v. Nelson*, 258 Kan. 688, Syl. ¶ 2, 907 P.2d 882 (1995).

## C. *Was Jefferson County denied due process by not receiving written notice of the formal hearing or by being limited in its participation in the proceedings?*

Hearings conducted by KCC must comply with provisions of the Kansas Administrative Procedure Act. K.S.A. 1996 Supp. 66-101d. Under K.S.A. 77-518(a), if a formal hearing is to be conducted, KCC is required to give "reasonable written notice at least 10 days prior to the hearing to all parties and to all persons who have filed written petitions to intervene in the matter."

Jefferson County petitioned to intervene on September 13, 1996. Intervention was granted on October 1, 1996. Apparently, Jefferson County was not served with a copy of this order. However, in its brief, Jefferson County states that its counsel obtained a copy of the October 1 order "in the middle of October when [he] came to the Commission building to inquire about the status of the case." The October 1 order also adopted a procedural schedule for the case, with a hearing set for October 29, 1996.

Jefferson County cites cases it asserts support reversing the KCC order when procedural due process has not been accorded to litigants. In those cases, the commission took action that was not warranted without furnishing the interested parties a notice. *Shark v. Northern States Power Co.*, 477 N.W.2d 251, 255 (N.D. 1991) (When less than 20 days' notice was given to public, commission should have granted short continuance of hearing on complex, technical matters regarding new method of cost recovery.); *VEPCO v. State Corp. Comm.*, 226 Va. 541, 312 S.E.2d 25 (1984) (Commission's summary dismissal of second component of company's two-part rate increase request 3 weeks after the application was filed and with no indication that summary dismissal was being considered was improper.).

These cases are distinguishable from the situation faced by Jefferson County. When Jefferson County sought to intervene on September 13, 1996, it had the burden to become informed about the status of the case. Jefferson County makes no argument that it was denied access to this information or the contents of the record. It was incumbent upon Jefferson County to make its own inquiries into the state of the proceedings.

This raises the related issue of the limitation of Jefferson County's intervention. In its motion, Jefferson County asked permission "to submit comments to protect the interest of its ratepayers." In its October 1 order, KCC granted Jefferson County's motion to intervene, stating:

"Jefferson County is a governmental unit having a similar interest to that of the City of Wichita. Under these facts and circumstances, the motion to intervene is granted. However, the Commission notes that notice was provided by publication and billing inserts. The failure of Jefferson County to respond in a more timely

manner is the sole responsibility of Jefferson County. Moreover, Jefferson County will not be allowed to delay or extend any of the procedural deadlines established by the Commission by reason of their late intervention."

Jefferson County asserts that because the KCC did not mention a limitation in granting intervention, it has no power to later limit the intervention. In denying Jefferson County's motion for published notice, mailed notice, and public hearings filed January 8, 1997, KCC stated Jefferson County's intervention, under its own request, was for the limited purpose of submitting comments. KCC notes that it "may impose conditions upon the intervenor's participation in the proceedings, either at the time that intervention is granted or at any subsequent time." K.A.R. 82-1-225(c). The conditions it may impose are listed and include "limiting the intervenor's use of discovery, cross-examination and other procedures so as to promote the orderly and prompt conduct of the proceedings." K.A.R. 82-1-225(c)(2).

Jefferson County points to this court's recent decision in *Western Resources* to support its argument that KCC cannot retroactively limit a litigant's participation in a KCC proceeding. In *Western Resources*, the KCC consolidated three dockets for proceedings without indicating a limitation in the nature of the consolidation. After the consolidated dockets had proceeded through evidentiary hearing, a final decision by KCC, and an appeal to this court, and while the appeal was still pending on a petition for review to the Kansas Supreme Court, the KCC entered an order asserting for the first time that the dockets were consolidated for hearing only. This court found that when the KCC failed to state the limited nature of the consolidation at the time it was done, and in fact waited until after an appellate decision to clarify this, it was too late to change the consolidation. 23 Kan. App. 2d at 666.

This case is easily distinguished from *Western Resources*. Placing limitations on a late intervenor's participation is much different than changing the nature of consolidated dockets after an appellate decision. Although KCC did not initially specify that Jefferson County's intervention was limited to making comments, it cautioned Jefferson County that the procedural schedules would not be delayed or extended due to its late joinder in the case. Thus,

from its earliest involvement, Jefferson County was warned that its participation would be subject to limitation. Also, K.A.R. 84-1-225(c) specifies that conditions may be imposed on intervention when it is granted or "at any subsequent time."

The notice to KPL and KGE customers was adequate. Due to Jefferson County's late request to intervene and its even later request for additional notice and a hearing, we find that KCC did not act unlawfully, unreasonably, arbitrarily, or capriciously in limiting Jefferson County's intervention.

## II. PROCEDURAL CHALLENGES TO THE SETTLEMENT AGREEMENT.

### A. Does KCC have power to approve a nonunanimous settlement agreement?

KIC argues that KCC did not have authority to approve a nonunanimous settlement agreement and that such approval violated the right to due process of those parties who did not support the settlement. As authority for this argument, KIC cites the Kansas Supreme Court's statement in *Kansas Gas & Electric Co. v. Kansas Corporation Comm'n*, 239 Kan. 483, 488, 720 P.2d 1063 (1986), that in fixing a rate within the zone of reasonableness the court must apply a balancing test considering the interests of all concerned parties.

Although Farmland does not argue KCC has no authority to adopt a nonunanimous settlement, Farmland maintains that KCC can do so only on the merits after making appropriate findings. KCC does not contest Farmland's claim, pointing out that Farmland relies upon a United States Supreme Court decision. In *Mobil Oil Corp. v. FPC*, 417 U.S. 283, 312-14, 41 L. Ed 2d 72, 94 S. Ct. 2328 (1974), the Court rejected an argument that the Federal Power Commission had no power to adopt as a rate order a settlement proposal that lacks unanimous agreement of the parties to the proceeding. A regulatory commission can consider a nonunanimous proposed settlement on the merits and adopt it after making an independent finding, supported by substantial evidence on the record as a whole, that the proposal will establish just and reasonable rates. The Court pointed out that "[t]he choice of an appro-

priate structure for the rate order is a matter of [Federal Power] Commission discretion, to be tested by its effects. The choice is not the less appropriate because the Commission did not conceive of the structure independently." 417 U.S. at 314. See also *Oxy USA, Inc. v. F.E.R.C.*, 64 F.3d 679, 690 (D.C. Cir. 1995) (Federal Energy Regulatory Commission's decision to approve part of a contested settlement must be supported by substantial evidence.).

Because KCC has broad powers to set electric rates and is not prohibited from considering proposals submitted by the parties, we reject KIC's argument that KCC has no power to consider the nonunanimous settlement agreement.

*B. Did KCC's conditional approval of the amended settlement agreement constitute a prejudgment of the issues and violate due process of law?*

KPP argues that when the KCC "conditionally approved" the amended settlement agreement, it abandoned its duty to independently weigh evidence presented at a hearing at which all parties have an opportunity to be heard. In an order of October 29, 1996, KCC stated that the total revenue adjustment set forth in the amended agreement was within the guidelines of its October 1 order and was supported by substantial evidence presented at prior hearings; therefore, the commission "conditionally approves the Amended Agreement subject to the limited hearing described below." The KCC rejected requests to continue the hearing scheduled for November 5 or to set a new procedural schedule.

KPP asserts KCC's conditional approval of the agreement and denial of additional discovery limited KPP's opportunity for a hearing and subtly shifted the burden of proof to opponents of the settlement agreement. KPP argues that members of KCC should have disqualified themselves from sitting in a proceeding that required them to exercise judicial or quasi-judicial power.

Any deficiencies in KCC's October 1 order were corrected by its order of October 29 clarifying the nature of the hearings, where it specified that it would rule on the motion to approve the amended agreement at the conclusion of the hearing. The order also stated: "The Commission has not issued an order granting final

approval of the Amended Agreement." The order explained that the October 29 order was "necessary to ensure time for adequate preparation; to facilitate a fair, orderly and efficient hearing process; and to promote the timely resolution of these matters within the statutory time constraints and without any unnecessary delay." At the hearing, KCC clarified that it considered this an ongoing proceeding and that it would decide upon the reasonableness of the amended settlement agreement after hearing all the evidence. Therefore, KPP's argument that commissioners prejudged the issue and should have recused themselves fails.

## III. DID KCC ERR IN APPROVING THE AMENDED SETTLEMENT AGREEMENT?

The amended settlement agreement was orally adopted by the KCC at the end of the presentation of evidence at the hearing on November 5, 1996. This was documented by a written order filed January 15, 1997. The order summarized the proposed settlement as follows:

"Western agreed to decrease KGE and KPL electric rates by a total of $75.0 million. The proposed rate reduction would be implemented on a staggered basis beginning with a $36.3 million annual rate reduction for KGE customers and a $10.0 million annual rate reduction for KPL customers effective February 1, 1997. The current interim $8.7 million KGE rate reduction would become final. Then, on June 1, 1998, an additional $10.0 million annual rate reduction would be implemented for KGE customers. This $10.0 million rate reduction would be removed from Western's Regulatory Plan proposed in the [Kansas City Power & Light Company] Merger Docket. [Footnote omitted.] And finally, effective on June 1, 1999, another $10 million annual rate reduction would be implemented for KGE customers."

In explaining its adoption of the amended settlement agreement, KCC referred repeatedly to testimony about the opportunity to reduce rate disparity between KPL and KGE. Farmland and KPP argue that this shows KCC used a combined cost-of-service analysis which KCC had never used before in evaluating WRI.

Traditionally, utility rates are set by determining "(1) a rate base, (2) a fair rate of return, and (3) reasonable operating expense. In determining these factors, there are numerous elements pertaining to each which must be fairly and reasonably determined if a fair

return is to result." *Southwestern Bell Tel. Co. v. State Corporation Commission*, 192 Kan. 39, 47, 386 P.2d 515 (1963). James Martin, WRI's vice president of finance, testified that WRI did not support combining cost of service to determine rates, but understood it could be done to support the amended settlement agreement. Staff, CURB, and City of Wichita urged KCC to view KPL and KGE as a combined entity operating as one unit and to rely upon the overall benefits of the settlement to conclude it resulted in just and reasonable rates providing a fair rate of return.

KPP asserts that by departing significantly from its traditional policy of using a separate cost-of-service analysis to set rates for KPL and KGE, KCC's final order has granted electric utilities a competitive advantage over other utilities and relied upon social policy to set rates, which unlawfully discriminates against other utilities. However, KPP cites no legal authority to support its claim.

Farmland argues that even if all KGE shares are owned by WRI and all KGE employees are WRI employees, it is improper to treat KGE and KPL as a combined corporate entity because they still exist as separate corporations. Farmland characterizes this as an attempt to pierce the corporate veil. A corporation and its shareholders are presumed separate and distinct; mere single ownership of a corporation is not sufficient to justify a disregard of the corporate veil. *Sampson v. Hunt*, 233 Kan. 572, 579, 665 P.2d 743 (1983).

Farmland points to several factors that establish KPL and KGE operate as separate entities. KPL and KGE file separate annual reports with KCC and the Federal Energy Regulatory Commission, file separate and independent financial statements, have separate long-term debt liabilities, own and operate separate distribution facilities, and have separate electric customers. Also, the fact WRI employees work for KGE is not uncommon in the utility industry.

Using a different legal theory, Farmland again attacks the combined cost-of-service approach by arguing that it violates a basic principle of utility rate making that "one class of consumers shall not be burdened with costs created by another class." *Jones v. Kansas Gas and Electric Co.*, 222 Kan. 390, Syl. ¶ 10, 565 P.2d

597 (1977). Farmland asserts that KCC has violated this regulatory principle by shifting the cost of service within KGE's exclusive service territory to ratepayers within KPL's territory.

Farmland directs this court to the decision in *Maine Water Co. v. Public Utilities Com'n*, 482 A.2d 443 (Me. 1984), arguing that the proceedings are remarkably similar to this case. Maine Water operated several water company subdivisions. Each subdivision constituted a complete and geographically independent water system, serving its own distinct group of customers, with no common source of water supply or any other physical interconnection. Two of the subdivisions were sold. The regulatory commission treated the gain on the sale as available to offset in part future water rates that otherwise would be charged customers in the remaining divisions. 482 A.2d at 446.

The Maine Supreme Court held that this was improper because the remaining customers had no rationally supportable claim to any flow-through of benefit of gain the company realized in selling the two subdivisions. The court noted the remaining ratepayers never bore any risk of loss of the two sold divisions. The court further noted the commission gave no reasoning and cited no authority to support "[s]uch a 'cross-subsidization' [that] runs counter to the separate treatment historically given the Maine Water divisions for ratemaking purposes and is antagonistic to a basic goal of ratemaking to 'protect one class of customers from paying the costs attributable to another class.' [Citation omitted.]" 482 A.2d at 449.

KCC defends its use of a combined cost-of-service analysis in evaluating the amended settlement agreement by pointing out that it is not required to use a particular methodology. In *Kansas Gas & Electric*, the Kansas Supreme Court noted that a public utility is not entitled to use a particular formula or method in valuing property for rate-making purposes. Instead, KCC should decide which formula should be used under the facts and circumstances of the case. 239 Kan. at 496. KCC was aware that considering KPL and KGE as an integrated operation deviated from its prior treatment of these companies.

To justify its changed approach in evaluating KPL and KGE, KCC refers to the "Columbia Gas Rule." Under this rule, a com-

mission "bears the burden of explaining the reasonableness of any departure from a long standing practice, and any facts underlying its explanation must be supported by substantial evidence." *Columbia Gas Transmission v. Fed. Energy Regulatory*, 628 F.2d 578, 586 n.31 (D.C. Cir. 1979). Kansas has also recognized that when an administrative agency deviates from a policy it had adopted earlier, it must explain the basis for the change. *Water District No. 1 v. Kansas Water Authority*, 19 Kan. App. 2d 236, 243, 866 P.2d 1076 (1994).

WRI urges this court to follow the well-founded rule in Kansas that vests the KCC with broad discretion in exercising its power and performing its duties. The court must recognize that the legislature by statute gave the commission a considerable degree of discretion when supervising electric public utilities. *Central Kansas Power Co. v. State Corporation Commission*, 221 Kan. 505, 507, 561 P.2d 779 (1977). This court is not to substitute its judgment for that of the administrative agency as long as the record contains competent evidence to support the agency's decision. See *Southwest Kan. Royalty Owners Ass'n v. Kansas Corporation Comm'n*, 244 Kan. 157, 165, 769 P.2d 1 (1989).

Throughout the proceedings, numerous parties expressed concern about the rate disparity between KPL and KGE customers. Staff consistently urged KCC to decrease the disparity in rates between KGE and KPL, even recommending that all reductions in rates be given to KGE customers and none to KPL customers. The testimony presented by Staff's expert, James Proctor, in support of the amended settlement agreement continued to urge KCC to reduce the disparity of rates. Proctor noted WRI provided KGE's capital budget, corporate financing, operational decision making, and dispatches its generation and transmission assets to meet the needs of its customers generally. In Proctor's opinion, the rate disparity between the two companies was a function of corporate structures and was not justified based on the way the companies operate. Proctor supported the method of decreasing rate disparity proposed in the settlement.

All parties recognized that WRI operated an integrated power system. As a result, power for KPL customers was not just supplied

from what were historically KPL facilities. In fact, according to Proctor, Wolf Creek, historically a KGE facility, "is the first base load generating station dispatched by Western Resources" because its per unit variable costs for generating electricity are lower than costs at other generating stations. However, Proctor testified that because of high fixed costs associated with Wolf Creek, when these costs are included in calculating the expense of producing electricity, it is the most costly to WRI on a per kilowatt hour of output basis.

Although WRI filed separate applications with KCC proposing an integrated rate plan with its natural gas division, WRI's efforts to maintain its subdivisions as distinctly separate should not prevent KCC from exercising its discretion to evaluate the two electrical subdivisions of WRI on a combined cost-of-service basis. Since KPL merged with KGE and became WRI, KPL customers have continued to enjoy low rates well below the national average. Meanwhile, KGE customers' rates were 5 percent above the national average and 20 percent above the regional average. Because WRI runs an integrated company, the low cost of generating electricity at Wolf Creek contributes to the low rates enjoyed by KPL customers, while KGE customers pay the price of the high fixed costs associated with Wolf Creek.

KCC took care in its order approving the amended settlement agreement to explain why it concluded it was appropriate to depart from its historic treatment of KGE and KPL as separate entities. Based upon the integrated operation of WRI and the benefits enjoyed by KPL customers due to this integration, KCC did not violate the principle against setting rates that burden one class with costs created by another. KCC was seeking to establish rates that reasonably relate to the costs incurred. While KPL customers should not be burdened with costs attributable to KGE customers, it is appropriate to recognize that KPL customers benefit from the inexpensive generation of electricity provided by Wolf Creek. Unlike *Maine Water Co.* and *Jones*, the ratepayers who are part of WRI's integrated system are not distinct classes of customers. As a result, we conclude that the KCC did not act improperly in using

a combined cost-of-service or integrated approach in setting rates for KPL and KGE.

### A. Was the amount of the rate reduction appropriate?

KPP, Farmland, KIC, and Jefferson County argue that the amount of the rate reduction is inadequate in light of expert testimony discussing WRI's cost of service, that the reduction is improperly allocated between KPL and KGE ratepayers, and that the phase in of KGE amounts are not supported by substantial evidence. They cite to testimony by various witnesses to support their respective arguments.

In particular, KPP argues the amount of reduction cannot be supported in light of testimony by its expert, Gary Harpster. KPP pays particular attention to Harpster's testimony that WRI's treatment of the LaCygne sale and leaseback violated generally accepted accounting principles because the gain should have been deducted from its rate base.

In spite of contradictory testimony that may be present in the record, this court must consider whether KCC's action is supported by substantial competent evidence. K.S.A. 77-621(c)(7). This means evidence must possess "something of substance and relevant consequence, and [must furnish] a substantial basis of fact from which the issues tendered can reasonably be resolved." *Southwestern Bell Tel. Co. v. Kansas Corporation Commission*, 4 Kan. App. 2d 44, 46, 602 P.2d 131 (1979), *rev. denied* 227 Kan. 927 (1980). Furthermore, if KCC's actions are taken with regard to the benefit of all interested parties and has foundation and is supported by fact in the record, it is not unreasonable, arbitrary, or capricious. K.S.A. 77-621(c)(8); *Pork Motel, Corp. v. Kansas Dept. of Health & Environment*, 234 Kan. 374, 381, 673 P.2d 1126 (1983).

KCC relies upon testimony presented by its witnesses and testimony by WRI experts James Martin and Kelly Harrison. Staff's prepared testimony estimated total revenue excess of WRI's electric operations at $110.4 million. The cost-of-service analysis prepared by Staff's experts contained 37 adjustments, which totaled approximately $67 million to WRI's operating expenses, and 10 adjustments, which totaled a negative $698 million to WRI's rate

base. Relying upon prefiled testimony by Staff witnesses, Proctor found the proposed rate reductions of $75 million reasonable, based upon the range of possible litigation outcomes prompted by the range of return on equity. During his testimony, Proctor identified several adjustments that Staff had identified to be "at risk," which means the adjustments may or may not be accepted by KCC if litigated. Considering these adjustments, Proctor calculated a potential litigation outcome of approximately $81.5 million in excess revenue. Proctor also analyzed the impact on revenue requirement due to changes in the rates of return of equity from 10.75 percent to 11 percent. Proctor concluded each .25 percent change in return on equity equated to approximately a $4.5 million change in revenue requirement.

KCC also considered testimony offered by WRI estimating the operating income and rate base of KPL and KGE. WRI offered testimony that an appropriate return on equity should fall in the range of 12.5 percent. Martin, on behalf of WRI, testified the rate reductions would allow KGE and KPL rates to compare favorably to the national averages of electric rates, yet allow WRI to be financially sound. Martin noted WRI desired to reduce KGE rates and estimated the amended settlement agreement would result in KGE rates 10 percent below the national average and KPL rates 28 percent below the national average. Martin discussed concerns WRI faced if the proceedings were fully litigated, which gave WRI the incentive to enter the amended settlement agreement.

KCC recognized testimony in opposition to the amended settlement agreement given by KPP witness Harpster. Yet, KCC noted that rather than conducting an independent audit, Harpster relied upon Staff's schedules. KCC noted these were later updated, suggesting Harpster's testimony was not as informed as others.

In deciding whether to accept the amended settlement agreement, KCC recognized that Staff and WRI had evaluated the risks and hazards of litigation. WRI had vigorously contested Staff's position contained in cost-of-service testimony and rate of return recommendations filed May 22, 1996, and cost of service and rate of return recommendations filed October 14, 1996. Although WRI

continued to oppose using a combined cost of service to determine rates, it recognized it could be used to support this settlement.

A benefit of settlement occurs if parties agree upon a specified rate that is in the public interest without the expense or risk of litigation. The KCC determined that the evidence clearly supported Staff's findings that a rate base of $2,330,624,333, an operating income of $256,006,938, and a return on equity of 11.11 percent were within a reasonable range of the essential elements of a cost of service given WRI's and Staff's litigation positions. After considering the interests of all the parties, KCC concluded the proposed rate reductions were justified on a cost-of-service basis and resulted in a return on equity within a "zone of reasonableness." See *Kansas Gas & Electric Co. v. Kansas Corporation Comm'n*, 239 Kan. 483, 488-91, 720 P.2d 1063 (1986). Consequently, we determine that KCC properly approved the reductions.

### 1. Allocation of reduction.

Appellants argue allocation of $65 million to KGE customers and $10 million to KPL customers was improper. Under the cost-of-service studies presented, the lowest revenue excess figures presented for KPL showed a revenue excess paid by KPL ratepayers of $39.9 million, yet their rates would be reduced by only $10 million. Meanwhile, that same cost-of-service study by Staff indicated KGE revenue excess would be $67.2 million, but KGE rates would be reduced by $65 million. Several appellants argue this is only justifiable using a combined cost-of-service analysis and results in inequitable rates for KPL customers.

KCC points out the rate reductions allocated for both KPL and KGE are within the revenue excesses shown on Staff's schedules. Because the reductions are within the rate excesses determined on an individual company basis, KCC found that KGE rate reductions are not being subsidized by KPL ratepayers.

Additionally, Staff examined the allocation of rate reductions on a company-wide basis. Because KCC clearly stated its desire to reduce rate disparity between KPL and KGE and the evidence

supported that decision, KCC allocation of rate reductions were proper.

## 2. Phase in of allocations.

Although it was recognized that WRI has a revenue excess, WRI was allowed to phase in the rate reduction over a 2-year period. Farmland objects to the phase-in allocations, noting the excessive rates of return KGE and KPL will earn. Citing *Power Comm'n v. Hope Gas Co.*, 320 U.S. 591, 88 L. Ed. 333, 64 S. Ct. 281 (1944), KCC states that a fair rate of return is one that is "(1) commensurate with the return to enterprises of corresponding risks; (2) sufficient to maintain the credit and financial integrity of the regulated company; and (3) adequate to allow the company to attract capital." KCC continues by noting that the Kansas Supreme Court approved the *Hope* criteria in *Kansas Gas & Electric Co.*, 239 Kan. at 489-91. In *Kansas Gas & Electric Co.*, the court stated:

"[T]he *Hope* court emphasized that the focus of inquiry is properly upon the end result or 'total effect' of the rate order, rather than upon the rate-setting method employed. The court described the rate-setting process as a balancing process involving the weighing of certain enumerated interests of the consumer and of the investor. The court stated that the rate-making process involves a balancing of the investor and the consumer interests, and that public utility regulation does not insure that the business shall produce net revenues." 239 Kan. at 489.

Here, KCC relied upon the testimony of WRI witness Martin, discussing the financial integrity of WRI, to justify the phase-in aspect of the amended settlement agreement. Regarding the first settlement agreement, which KCC rejected, Martin testified that WRI shareholders expected a reasonable rate of return and WRI would not enter into a stipulation that would threaten this. Regarding the amended settlement agreement that KCC adopted, Martin testified that the same reasons existed for WRI to enter into the amended settlement agreement, including that it was good for "all constituents, our consumers and our shareholders." Martin also testified that WRI "shareholders can expect a financially strong company to emerge with the capacity to continue its business plans.".

Martin's testimony provided evidence to support the phase in of the rate reduction. KCC had to balance the interests of investors and customers. Here, KCC recognized it could consider WRI's financial integrity in deciding rate reductions. Because of the magnitude of the overall rate reductions, KCC found that the phase-in aspect of the amended settlement agreement was not unreasonable. Therefore, we find that the KCC properly exercised its discretion in adopting the phase-in provision.

## B. Should the merger savings have been allowed?

The Acquisition Premium (AP) refers to the amount KCC approved KPL to pay to acquire all KGE stock in excess of book market value of KGE assets. In the merger order, KCC stated if merger costs were adequate, WRI could recover the AP in 1995 or at the next rate hearing, whichever occurred first.

Farmland vigorously contests treating the AP as a cost and including it in future rates by setting it off against inflated merger savings. Farmland and KPP are concerned that nothing in the record supports savings of $40 million a year based upon the KPL and KGE merger. KPP witness Harpster even asserts many of the savings experienced by KPL would have occurred if WRI would have matched the productivity improvements of the average utility.

KCC and WRI cite to testimony by WRI witnesses that discussed merger savings. Harrison described his calculations in detail and estimated conservative merger savings of $40 million. Martin believed merger savings could be justified from $53 million to $60 million if customer growth and productivity were taken into account. Staff estimated merger savings at $28.8 million, but did not consider customer growth and productivity. Staff witness Proctor recognized that taking customer growth and productivity into account was not consistent with the indexing methodology used in a prior order, but saw merit in its use in these proceedings. Proctor also recognized merger savings are hard to calculate and become more difficult to track as time passes and the merger becomes more remote. Although difficult to set an accurate amount, Proctor urged KCC to adopt the settlement because he felt it was advantageous to set

an amount, and this one seemed reasonable. We find KCC acted properly in adopting the merger savings.

## IV. WAS REBATE ALLOCATION PROPER?

Farmland and KIC contest KCC's allocation of the two $5 million rebates on a per customer, rather than annual usage, basis. This means that each customer will receive the same amount of rebate regardless of whether their annual electric bill is $600 or $12 million. Also, the rebate will be distributed as of January of each rebate year regardless of whether the customer has been with WRI for 1 day or for a long time. Farmland further asserts the testimony supporting these rebates suggests savings to the company that should be used to reduce WRI's cost of service.

KIC argues that the method to distribute this rebate violates the public utility principle that one class of customers shall not be burdened with costs created by another class. See *Jones v. Kansas Gas and Electric Co.*, 222 Kan. 390, Syl. ¶ 10, 565 P.2d 597 (1977). Also, KIC asserts the distribution of rebates adopted by KCC violates its duty to fix a zone of reasonableness after balancing the interests of all concerned parties. See *Kansas Gas & Electric Co.*, 239 Kan. 490-91. KIC is particularly bothered by KCC's statement that "[a]ll parties agreed that the rebate allocation was left to the discretion of the Commission," insisting that it never agreed to such distribution and joined in the customers' settlement proposal allocating rebates on the basis of customer usage.

KCC approved the rebates as part of the amended settlement agreement. WRI and Staff recommended that the rebates be distributed in the same fashion as rate reductions; customer intervenors recommended that the rebates be distributed on a per customer basis. KCC noted the rebates were not related exclusively to usage but were generated by synergies of the total company operations and enterprises. If it had chosen to order distribution on a customer-usage basis, large industrial customers would have seen large rebates while small business or residential customers would have seen small rebates, if any. In deciding how to distribute the rebates, KCC was exercising its discretion in seeking a result that was fair and just to all interested parties. See *Kansas Gas &*

*Electric Co.*, 239 Kan. at 491. KCC's action was supported by evidence in the record and was not unreasonable, arbitrary, or capricious.

## V. IS THE RATE DESIGN SETTLEMENT APPROVED BY KCC SUPPORTED BY SUBSTANTIAL EVIDENCE? WAS KCC'S ACTION IN ADOPTING IT UNREASONABLE, ARBITRARY, OR CAPRICIOUS?

Having concluded KCC did not err in approving the amended settlement agreement concerning revenue requirements, now this court must decide if KCC erred in approving a proposal offered by Staff and WRI concerning rate design (WRI/Staff proposal). A competing proposal was submitted by Farmland, CURB, and KIC (customers' proposal). Farmland, KIC, and CURB argue that the court should find KCC erred in adopting the WRI/Staff proposal.

If a regulatory commission is presented with a nonunanimous settlement agreement, it can adopt the agreement if it makes findings on the merits that the agreement is fair, just, and reasonable and supported by evidence in the record. *Mobil Oil Corp. v. FPC*, 417 U.S. 283, 314, 41 L. Ed 2d 72, 94 S. Ct. 2328 (1974). However, the commission does not have to adopt the proposal. Here, KCC reviewed the customers' proposal and stated reasons why it declined to accept it.

First, KCC noted that usually cost-of-service studies are compiled for the various customer classes. These studies are then used to assure rate design is structured to avoid one class of customers from being burdened with costs created by another class. *Jones*, 222 Kan. 390, Syl. ¶ 10. KCC points out no class cost-of-service study was done to support customers' proposal. The customers' proposal assigned 6 percent of the rate reduction to special contract customers without knowing whether that would bring these rates below cost of service. Also, this 6 percent was derived from decreasing rate reductions to three other classes: general service class, high load factor class, and other customers class. Under existing rates, the general service class has one of the highest returns of any class of customer.

Second, KCC decided not to include special rate contract customers in the rate reductions. KCC's primary reason for excluding special rate contract customers from the rate reductions was because the special rate contracts are negotiated at arm's length to provide special rates for large industrial users. Special rate contracts are designed to forestall a company from installing self-generation, to encourage load increases, or to provide a lower rate as a competitive alternative. Special rate contracts have a base rate that reflects a minimum kilowatt hour usage under the standard tariff charges and a block representing new growth at a special discounted rate to encourage load increases. Presumably, the rates under special rate contracts are below the regular rates for that class of customers, and KCC did not believe these customers should receive further reductions. Yet, Farmland asserts nothing in the record establishes that the base rate is lower than a regular cost-of-service rate for that class of customers.

KCC was concerned that giving special rate contract customers a percent of the reductions would be interfering with private contracts, which can only be interfered with when " 'the public welfare is being adversely affected by such contracts,' " quoting from *Kansas Power & Light Co. v. Mobil Oil Co*, 198 Kan. 556, 559, 426 P.2d 60 (1967). Requiring a utility to offer a customer a reduced electric rate would hardly seem adverse to public welfare; if the customer declined, it could continue paying the contract rate.

Last, KCC asserts it is justified in not including special rate contract customers in the allocation of reductions because K.S.A. 1996 Supp. 66-117 does not mention special contracts. Farmland points out that KCC's reliance on K.S.A. 1996 Supp. 66-117 is not supported by the language of the statute, which applies to any changed "rate, joint rate, toll, charge or classification or schedule of charges, or any rule or regulation or practice pertaining to the service or rates" of a public utility. K.S.A. 1996 Supp. 66-117(a) and (b).

Although not all reasons given by KCC provide a basis for rejecting the customers' proposal, at least one of them does. The lack of a class cost-of-service study made it difficult to evaluate how the proposal would affect the various customer classes. Also, evidence regarding the impact of sharing the reductions with special rate

contract customers did not explain how this would affect the other customers. KCC is required to assure that a rate design does not burden one class with costs that should be borne by another. The deficiency of the customers' proposal about what impact their proposal would have on the various customer classes provided an adequate basis for KCC to reject the customers' proposal.

Nevertheless, having decided not to accept the customers' proposal, KCC still had to make an independent decision whether to accept the WRI/Staff proposal and make findings showing it was fair and reasonable and supported by evidence in the record.

The WRI/Staff proposal "recommended that one-third of the total rate reductions be allocated to the residential class of customers and the remaining two-thirds be spread among the various commercial and industrial class customers." The WRI/Staff proposal also contained specific recommendations regarding tariff changes to update and consolidate the customer classes and customer charges, which are set out in paragraph 71 of KCC's order. The WRI/Staff proposal did not allow rate reductions to special rate contract customers or space heating customers.

Farmland argues that the evidence does not support the WRI/Staff proposal because the witnesses KCC relies upon base their testimony on WRI's or Staff's class cost-of-service studies, which are both incorrect. These studies do not make adjustments for rate reductions approved by KCC in the amended settlement agreement. Also, KCC relied upon combined cost-of-service analysis to approve the amended settlement agreement and, therefore, must continue using that analysis in determining rate design.

One of the main witnesses KCC relied upon in adopting the WRI/Staff proposal was Joe Williams, a rate design and depreciation analyst with KCC. Williams explained why special rate contract customers should not share in rate reductions. Williams testified that normally KCC sets rates and customers pay whatever is set, but in the last 10 years some larger customers of larger utilities took steps to negotiate beneficial rates because they had alternatives to either gas or electric service at more advantageous rates. Williams continued: "In doing so, in my opinion, they have removed themselves from that traditional ratemaking regime, if you

will, and have become responsible for along with the company for [*sic*] setting their own rates based on the competitive alternatives that they have available to them."

Although KCC rejected the customers' proposal because it was not supported by a cost-of-service study, KCC accepted WRI's cost-of-service study even though it was invalid. Moreover, KCC recognized that a higher burden was placed on the general service class, but KCC made no effort to solve the problem. Instead, KCC's goal was not to make it worse. Because the customers' proposal and WRI/Staff proposal were not mutually exclusive, we find KCC's acceptance of the WRI/Staff proposal unsupported by substantial competent evidence and remand for further proceedings on this issue.

## VI. WERE KPL CUSTOMERS ADEQUATELY REPRESENTED?

### A. Did CURB have a conflict of interest created by representing both KGE and KPL customers that prevented it from adequately representing KPL ratepayers?

Jefferson County asserts that it was the only party in the proceeding that represented the interests of the KPL residential ratepayers. Jefferson County asserts that CURB, which has a statutory mandate to represent the interests of small business and residential customers, had a clear conflict of interest between representing both KGE and KPL ratepayers. In fact, Jefferson County asserts that CURB acknowledged this conflict when expressing its concern for the rate disparity between the two sets of consumers.

The amended settlement agreement, which CURB supported, reduced rates of KGE customers in a much larger proportion than rates of KPL customers. Jefferson County asserts KCC's approval of the amended settlement agreement that contained this disparity of rate decrease was unreasonable because KPL and KGE ratepayers were represented by the same attorney.

The large rate disparity between KGE and KPL customers was recognized by all the parties. CURB took the position that this disparity should be narrowed and that these two companies should move toward complete merger. CURB points out that as part of the amended settlement agreement it pursued, its goal to reduce

the disparity was achieved while at the same time gaining a small reduction for KPL customers even though their rates are among the lowest in the country. The record does not establish that CURB's role in representing small business and residential customers prevented it from representing both KPL and KGE ratepayers. CURB's position seeking lower rate disparity and a fully integrated company was clearly stated throughout the proceedings. Consequently, we find that CURB did not have a conflict of interest that prevented it from fulfilling its statutory role of representing the interests of small business and residential customers.

### B. Did KCC err in denying Jefferson County's request for compensation under the Public Utility Regulatory Policies Act of 1978?

An intervenor seeking compensation must file a request within 30 days of the filing of an application, a complaint, or an order of the commission initiating a proceeding. K.A.R. 82-1-241. Here, KCC issued an order January 17, 1996, that approved a stipulation allowing Staff to file testimony without objection from WRI to support specific changes in electric rates. Any doubt about the nature of the proceeding became clear on June 14, 1996, when KCC allowed WRI's May 22, 1996, request to amend its application to file its own cost-of-service studies, which are normally considered in a traditional rate case.

Jefferson County filed its motion to intervene on September 13, 1996. Yet, Jefferson County did not file its request for compensation under the Public Utility Regulatory Policies Act of 1978 (PURPA), Pub. L. No. 95-617, 92 Stat. 3117 (1978) (currently codified in 16 U.S.C. § 2601 et seq. [1995]), until February 3, 1997. This was after the hearings were completed, after all post-hearing briefs had been filed, and after KCC had issued a final order. Even if Jefferson County was misled about the nature of the action by the notice it received under the KCC order of December 19, 1995, once it became aware of the nature of the proceeding, it had to act diligently in pursing its claims. The application was filed more than 4 months after Jefferson County sought to intervene. Jefferson County's delay in filing its application for compensation is inex-

cusable here. This court will not consider whether Jefferson County could have qualified for compensation under PURPA if it had acted promptly. The application was clearly untimely. KCC did not act unlawfully, unreasonably, arbitrarily, or capriciously in denying Jefferson County's request for compensation.

## VII. DID KCC ERR IN ALLOWING WRI TO INCREASE ITS ADDITIONAL CAPACITY CHARGE IN THE GS RATE OF WRI'S TARIFF?

KIC argues that the KCC erred by failing to determine a rate design and allocation method to equitably apportion rate reductions among WRI's customers. KIC further argues that WRI arbitrarily modified the GS Rate of its tariff by raising the additional capacity charge in its GS Rate. However, KIC does not cite to any part of the record. KCC argues this issue was not raised previously before it and, therefore, cannot be raised on appeal. K.S.A. 1996 Supp. 66-118b. We agree. A party cannot raise an argument on appeal that was not considered below. *Peoples Natural Gas v. Kansas Corporation Commission*, 7 Kan. App. 2d 519, Syl. ¶ 1, 644 P.2d 999, *rev. denied* 231 Kan. 801 (1982).

Affirmed in part, reversed in part, and remanded.