(916 P.2d 76)
No. 75,918

KANSAS PIPELINE PARTNERSHIP, *Appellant*, v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, *Appellee*.

Opinion filed May 17, 1996.

*James P. Zakoura, Richard W. Hird,* and *David J. Roberts,* of Smithyman & Zakoura, Chartered, of Overland Park, and *Fred J. Logan, Jr.,* of Logan & Logan, L.C., of Prairie Village, for appellant.

*Larry M. Cowger,* of Kansas Corporation Commission, for appellee.

*Mark A. Burghart* and *W. Robert Alderson,* of Alderson, Alderson & Montgomery, L.L.C., of Topeka, for intervenor Citizens' Utility Ratepayer Board.

*John C. Frieden* and *Kevin M. Fowler,* of Frieden, Haynes & Forbes, of Topeka, and *David P. Batow* and *Gary W. Boyle,* of Williams Natural Gas Company, of Tulsa, Oklahoma, for intervenor Williams Natural Gas Company.

Before ELLIOTT, P.J., ROYSE and KNUDSON, JJ.

ELLIOTT, J.: Kansas Pipeline Partnership (KPP) and Western Resources, Inc., (WRI) entered into natural gas sales and transportation contracts. KPP submitted the contracts to the Kansas

Corporation Commission (KCC) for approval pursuant to K.S.A. 1995 Supp. 66-117(a). WRI also requested KCC approval of the contracts and requested permission to pass contract costs through to its customers. Complicating matters, the KCC shifted a $5.9 million Linchpin Development cost item from another rate hearing into this KPP application. The other rate hearing is currently pending in this court as appeal No. 75,730.

On judicial review, KPP asserts that because the KCC failed to make a decision on these contracts and the development cost item within time limits established by KCC regulations and K.S.A. 1995 Supp. 66-117(b), the contracts and other requested relief became "deemed approved" by operation of law. This is the ultimate question for us to decide on the merits of this appeal.

We agree with KPP and reverse.

A brief description of the major participants is as follows:

KPP is a natural gas public utility and the applicant before the KCC.

The KCC is the state regulatory agency with the power and authority to supervise and control intrastate natural gas public utilities doing business in Kansas. See K.S.A. 66-101 *et seq*.

WRI is a class A natural gas public utility, authorized to deliver natural gas to customers in Kansas, and was the other signatory to the KPP contracts for which approval was sought. WRI also sought approval of the contracts, but has not appealed the matter to this court.

Williams Natural Gas Company (WNG) is also a natural gas public utility and is a marketplace competitor of KPP.

The Citizens' Utility Ratepayer Board (CURB) is a state agency created to look out for the interests of individuals and small businesses in regulating public utilities.

The Federal Energy Regulatory Commission (FERC) is a federal agency regulating interstate pipelines which are within its exclusive jurisdiction.

The five contracts may be summarized thus: The contracts between KPP and WRI call for the sale and transportation of increased volumes of natural gas for delivery in Johnson, Wyandotte, Franklin, and Miami Counties in Kansas. Two of the three gas

purchase contracts require KPP to deliver natural gas to the city gates at Ottawa, Paola, and Osawatomie for a term of 20 years. The third gas purchase contract calls for KPP to transport and sell natural gas to delivery points in Johnson and Wyandotte Counties for a term of 10 years.

The two transportation contracts call for the construction of a 24-mile pipeline spur to connect the Panhandle Eastern Pipeline Company's facilities to those of WRI (the "Metcalf Contract"), and for KPP to provide natural gas to WRI for Johnson and Wyandotte Counties commencing in the year 2009 (the "2009 Contract").

*Jurisdiction*

Without detailing the various dates on which various pleadings were filed, we have determined the jurisdictional filings by KPP are timely.

We have exclusive jurisdiction to review any action of the KCC arising from a rate hearing. K.S.A. 1995 Supp. 66-118a(b). In KPP's original filing, it did not request a rate increase, but WRI did. The WRI docket was consolidated with the KPP filing. Additionally, the joinder of the Linchpin Project Development costs into this proceeding made it an action intimately related to a prior rate case. See *MAPCO Intrastate Pipeline Co. v. Kansas Corporation Comm'n*, 10 Kan. App. 2d 527, 530-31, 704 P.2d 989 (1985); *In re Application of Southwestern Bell Tel. Co.*, 9 Kan. App. 2d 525, 529, 685 P.2d 304, *rev. denied* 236 Kan. 875 (1984).

The parties seem to agree that this case is closely enough connected to an underlying rate case to give us jurisdiction.

While we have determined we have jurisdiction under K.S.A. 1995 Supp. 66-118a(b), a question still remains whether the KCC order of November 22, 1995, is reviewable.

By applying the relevant considerations of *Southwestern Bell*, the KCC order is a final agency action entitling KPP to judicial review. The KCC's denial of KPP's arguments that the contracts were "deemed approved" due to the expiration of time *is* a final decision on this issue. It has a direct effect on KPP and presents a legal question for our review. Further, ruling on this issue does not disrupt the orderly process of adjudication in the administrative

proceeding. The November 22, 1995, KCC order is final agency action subject to review.

In *Southwestern Bell*, we did not clearly state whether we were considering a final agency decision or a nonfinal agency decision ripe for interlocutory review. Either way, we have jurisdiction to consider KPP's appeal. See K.S.A. 77-607(b), K.S.A. 77-608.

## Merits

In orders mailed April 21 and 24, 1995, the KCC suspended the effective dates of the contracts for 180 days of their filing on March 31, 1995; the WRI rate request and the KPP contract dockets were consolidated. After numerous continuances, hearings were finally conducted between August 21, 1995, and September 6, 1995. At the close of the hearings, the KCC closed the record, ordered briefs filed by October 6, 1995, and took the dockets under advisement.

After briefs were filed but before the KCC issued a decision, FERC issued a draft order stating it had jurisdiction over KPP as an *inter*state pipeline. When FERC asserts jurisdiction, any state regulatory agency loses jurisdiction. As a result, the KCC staff on November 1, 1995, requested a stay pending a final order from FERC. KPP opposed the stay. The KCC issued a stay on November 3, 1995, and on November 22, 1995, issued an order superseding the earlier order, in which it found:

(1) Expiration of the initial 180-day time period set by the KCC did not cause the contracts to be deemed approved because that order was subject to further KCC orders and KPP did not object to the closing of the record as of October 6, 1995 (beyond the 180-day period);

(2) The KCC order of November 3, 1995, which was within the 240-day limitation of K.S.A. 1995 Supp. 66-117(b) was "probably a sufficient adjudication within the 240-day period of time";

(3) The KCC restarted the 240-day clock called for by K.S.A. 1995 Supp. 66-117(b) because the FERC finding of jurisdiction over KPP was a "substantial alteration of the facts" forming the basis for the KPP request; and

(4) "a continued stay at this juncture serves the public interest especially in light of the unbundling concerns raised by [s]taff should FERC ultimately find it has jurisdiction" over KPP.

On December 8, 1995, several things occurred:

(1) FERC stayed its assertion of jurisdiction over KPP and clarified that KCC orders regarding KPP will remain in effect until FERC made its final rulings in the case.

(2) The KCC denied KPP's request to reconsider its November 3, 1995, order because it was superseded by the KCC order of November 22, 1995.

(3) KPP requested reconsideration of the November 22 KCC order, which was denied on December 28, 1995.

(4) FERC issued an order clarifying a prior order. In this order, FERC stayed its assertion of jurisdiction over KPP until 60 days after an order on the merits of petitions for rehearing. FERC also ruled that, meanwhile, KPP could continue to provide services, collect rates on file with the KCC, and *"undertake all other activities authorized by [FERC] and the KCC."* (Emphasis added.)

On appeal, our scope of review is set forth in K.S.A. 77-621, which codified principles repeatedly recognized by Kansas courts. See, *e.g., Kansas Gas & Elec. Co. v. Kansas Corporation Comm'n*, 239 Kan. 483, 497-98, 720 P.2d 1063 (1986); *Midwest Gas Users Ass'n v. Kansas Corporation Commission*, 3 Kan. App. 2d 376, 380-81, 595 P.2d 735, *rev. denied* 226 Kan. 792 (1979).

Further, we recognize that the cardinal rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. *City of Wichita v. 200 South Broadway*, 253 Kan. 434, 436, 855 P.2d 956 (1993).

As indicated earlier, at the close of the technical hearings, the KCC ordered the filing of briefs by October 6, 1995. KPP did not object to the October 6 date, although it was beyond the 180 days mentioned in the original suspension orders which expired on September 27, 1995. Accordingly, we shall concentrate our evaluation of this appeal on the 240-day limitation contained in K.S.A. 1995 Supp. 66-117(b).

The KCC has never suggested this case is not controlled by K.S.A. 1995 Supp. 66-117(b). Although the statute does not specifically list "gas purchase contracts" or "gas service agreements," clearly these would fall within "practice pertaining to the service or rates of such public utility." See K.S.A. 1995 Supp. 66-117(a).

CURB argues this case is governed by K.S.A. 1995 Supp. 66-1,203, which specifically applies to natural gas public utilities. Pursuant to that statute, every natural gas public utility regulated by the KCC must furnish the KCC with copies of all contracts between natural gas public utilities and all jurisdictional services to be rendered by the utility. WNG also urged this position during oral arguments. This statute applies specifically to natural gas public utilities regulated by the KCC, while K.S.A. 1995 Supp. 66-117(b) merely applies to all public utilities regulated by the KCC.

If a general and a specific statute both apply to a given situation, they should be read together and harmonized when possible. See *Kansas Racing Management, Inc. v. Kansas Racing Comm'n*, 244 Kan. 343, 353, 770 P.2d 423 (1989). The provisions of these two statutes can be read consistently.

K.S.A. 1995 Supp. 66-117(b) applies when any public utility is requesting a change in its rates or services that will have an impact on its customers. On the other hand, 66-1,203 requires a natural gas public utility to file copies of its rates and contracts, even if no changes are requested. Although the statutes overlap to some extent, they are not inconsistent and both are applicable.

At last, we reach the core question for our determination: Is KPP's request for relief "deemed approved" by the KCC's failure to issue a final order on the proposed changes within the 240-day period mandated by K.S.A. 1995 Supp. 66-117(b)? We answer in the affirmative.

Preliminarily, at oral argument, the KCC acknowledged that 66-117 is the only statute permitting suspension of an effective date, and CURB candidly, but reluctantly, agreed that 66-117 controls this appeal.

No one contests that the KCC's authority is limited to that conferred by statute. *Cities Service Gas Co. v. State Corporation Commission*, 197 Kan. 338, 342, 416 P.2d 736 (1966); *Kansas-Nebraska*

*Natural Gas Co. v. Kansas Corporation Commission*, 4 Kan. App. 2d 674, 675, 610 P.2d 121, *rev. denied* 228 Kan. 806 (1980). We must determine what now happens when the KCC fails to exercise the power conferred on it by statute.

K.S.A. 1995 Supp. 66-117(b) specifically provides that the KCC shall not delay the effective date of a proposed change in rate or in any practice pertaining to service for more than 240 days beyond the date the utility filed its application with the KCC.

The statute further provides that if the KCC has not issued a final order within those 240 days, then

*"the schedule shall be deemed approved* by the commission and the proposed change shall be effective immediately, *except that* (1) . . . *any amendment to an application* . . . which increases the amount sought by the public utility . . . or substantially alters the facts used as a basis for requested change . . . shall, at the option of the commission, be deemed a new application and the 240-day period *shall begin again from the date of the filing of the amendment,* and (2) if hearings are in process before the commission . . . on the last day of such 240-day period, such period shall be extended to the end of such hearings plus 20 days to allow the commission to prepare and issue its final order." K.S.A. 1995 Supp. 66-117(b) (Emphasis added.)

No one contends the hearing was "in process before the commission" on the 240th day. The KCC closed the record and took the matter under advisement prior to expiration of the 240-day period. The question is whether either of the KCC orders of November 3 and 22, 1995, was a "final order" for purposes of 66-117(b). If so, both were entered within the 240-day clock. If not, we must decide whether the KCC acted properly in restarting the 240-day clock. We note that the KCC closed the record in these consolidated dockets at the conclusion of hearings on September 6, 1995. So far as we can determine, the KCC never reopened the record in these consolidated dockets. See K.A.R. 82-1-230(k), (l).

KPP filed its request for approval of the five contracts on March 31, 1995; the 240th day thereafter would be November 29, 1995. On November 2, FERC issued a draft order asserting jurisdiction over KPP, and on November 3 the KCC, *sua sponte*, determined the dockets should be stayed.

Then on November 22, 1995, the KCC issued another order affirming its order of November 3 and ordering these dockets be stayed until FERC took final, appealable action. This order also purported to restart the 240-day clock "(to the extent, if any, that it applies") as of November 2, 1995. The KCC also stated its November 22 order superseded its November 3 order.

"Final order" has been defined as one which terminates the litigation on the merits and leaves nothing to be done except to enforce the result. Black's Law Dictionary 630 (6th ed. 1990). In an administrative setting, a final order needs to be more than a mere procedural ruling, and "finality" should be interpreted in a pragmatic way. *Southwestern Bell Tel. Co. v. Kansas Corporation Commission*, 6 Kan. App. 2d 444, 452-53, 629 P.2d 1174, *rev. denied* 230 Kan. 819 (1981). See *Oilfield Fluid Motor Carriers v. Kansas Corporation Comm'n*, 234 Kan. 983, 988, 677 P.2d 982 (1984).

In the present case, the KCC orders enter a stay pending a decision by FERC. A "stay" is a suspension of a case. Black's Law Dictionary 1413 (6th ed. 1990). By entering a stay, the KCC did not issue a final order in the proceeding.

Accordingly, this case presents a good example of when a KCC order can be final agency action under 77-607(b)(1), but not a final order under 66-117(b). The KCC's decision rejecting KPP's argument the contracts should be deemed approved (66-117[b]) is a final ruling on that statutory interpretation question. Nothing is unresolved, rendering it a final agency action under 77-607(b)(1). On the other hand, since the KCC has made no ruling regarding whether KPP's contracts should be approved, it has not entered a final order on the proposed changes under 66-117(b).

As WNG argues, both times the "deemed approved" language appears in the statutes, the phrase refers to a "schedule." "Schedule" is not defined in any statute or any KCC regulation which we have been able to discover, and the parties have not referred us to any such definition. The general definition of "schedule" would cover almost any filing, and pragmatically, we conclude the KPP contracts and other documents appended to its application meet the requirement of a schedule. See K.A.R. 82-1-231; Black's Law Dictionary 1344 (6th ed. 1990).

The KPP contracts would change the practices pertaining to services made available by KPP for WRI's customers. Accordingly, the changes set forth in the contracts fall under the provisions of 66-117(b) requiring KPP to request approval of the changes.

Before leaving this aspect of the case, we need to discuss the legislative history for 66-117. Dramatic changes were made to KCC procedures in 1980 by the enactment of S.B. 881. L. 1980, ch. 200. Minutes of hearings before the House Ways and Means Committee on the bill make clear the legislature was aware it was making significant changes. Minutes to a hearing on April 8, 1980, report that Senator Frank Gaines supported the bill which would permit a utility to automatically get the increase sought when the KCC did not act within a certain time frame. See House Ways and Means Committee, 1980 Session, Minutes of April 8, 1980, p. 1. Throughout the debate on S.B. 881, the KCC was given only 180 days to decide a case, but the final bill changed this to 240 days.

Most of the testimony before the Ways and Means Committee uses the term "utility rate cases" in discussing the bill, but the term is never defined. Further, "schedule" is not mentioned, except in a proposed draft of the bill. A main proponent of the bill was Southwestern Bell Telephone Company (SWB), which argued time limits were not new and had been adopted by numerous regulatory agencies across the country. Testimony of Bill Ewing (SWB), Attached to Minutes of House Ways & Means Committee, April 8, 1980.

Opposing S.B. 881 was Pete Loux, then chair of the KCC. He argued the states which had adopted time limits had much larger staffs or were responsible for regulating fewer companies. Chairman Loux also presented a staff position paper authored by Brian Moline, then general counsel of the KCC. Moline expressed concern that the language of S.B. 881 was very broad and cautioned that the bill "changes long established public policy of Kansas." KCC Staff Position on S.B. 881, Attached to Minutes of House Ways & Means Committee, April 8, 1980, at 4.

Our review of the legislative history convinces us the purpose of S.B. 881 was to adopt time limits to remedy delays utilities had experienced with the KCC. Nothing in the legislative history sug-

gests the legislature intended to distinguish between "pure" rate cases and hybrid cases that could be considered "arising from a rate hearing" and thus appropriate for exclusive review by this court.

While S.B. 881 does not refer specifically to 66-118a, giving us exclusive jurisdiction over appeals arising from a rate hearing, the bill did amend 66-118g, setting the time limits in which we must decide such cases.

Nothing we have discovered suggests the time limits covered by S.B. 881 were intended to be different for rate cases under 66-117 as opposed to cases arising from a rate hearing pursuant to 66-118g. If a case arises from a rate hearing for purposes of 66-118g, legislative history suggests the time limits of 66-117(b) would also apply.

No one really contests that this case is one arising from a rate hearing. Under the express language of 66-117(b), the schedules/contracts are deemed approved and the proposed changes take effect immediately unless a final order is issued by the KCC within 240 days of KPP's application, or unless one of the exceptions applies.

Here, no final order was issued. As a result, our final question is whether the KCC had the statutory power and authority to restart the 240-day clock under the peculiar facts of this case.

K.S.A. 1995 Supp. 66-117(b) provides that after 240 days, the schedule is deemed approved *except* where an amendment to an application seeks an increase in the amount sought or substantially changes the facts used as a basis for the requested change.

The KCC interprets the statute broadly to include *any* change of the facts, regardless of whether an amendment to the application has been filed. We are unable to agree with the KCC's interpretation.

Here, none of the parties filed any amendment to the application for proposed change that increased the amount sought by the KPP. Thus, the only way this proceeding could be extended is if the KCC were correct in finding (1) that FERC's preliminary assertion of jurisdiction substantially altered the facts used as a basis for the

requested change *and* (2) that this gave the KCC the option to deem a new application had been filed.

The KCC does not directly address the problem created by the failure of anyone to file an amendment to the application. CURB does not address the need for an amendment either; rather, it argues the KCC was in substantial compliance with the statutory mandate when it restarted the 240-day clock. WNG asserts that 66-117(b) simply does not apply. As previously held, the legislature did not distinguish between types of rate hearings in enacting S.B. 881. The legislature intended the time limits to apply to all hearings requesting a change, including those arising from a rate hearing.

KCC regulations provide for specific procedures to follow when a public utility wants to revise or amend its application or schedules. See K.A.R. 82-1-231(d). Further, Chairman Loux, in his letter to Mike Hayden, then chair of the House Ways and Means Committee, specifically voiced his concern whether an amendment by an applicant would restart the time clock. Loux Memo dated April 8, 1980, attached to House Ways and Means Committee Minutes.

FERC issued its initial order on November 2, 1995. Yet in its order of November 22, the KCC recognized it had continuing jurisdiction over KPP. FERC then stayed its earlier order and clarified that KPP was allowed to undertake all activities authorized by the KCC. The KCC did not issue its order denying KPP's petition to reconsider until December 28, 1995.

The KCC argues that the FERC order asserting jurisdiction over KPP was a substantial alteration of the facts. An agency's interpretation of a statute should be given deference, but when reviewing a question of law, we may substitute our judgment for that of the agency. See *Hickey v. Kansas Corporation Comm'n*, 244 Kan. 71, 76, 765 P.2d 1108 (1988).

We note that the KCC was aware as early as June 2, 1995, that FERC was considering asserting jurisdiction over KPP. Since the parties were aware of FERC's interest in KPP for 5 months, we are unable to understand how FERC's order of November 2, 1995, is a substantial alteration of the *facts* used as a basis for the requested approval of contracts. The facts supporting the proposed

changes remained the same although the status of the parties may well have been altered.

Simply put, the punctuation of the statute in light of the legislative history precludes the KCC's interpretation of 66-117(b).

The legislature is presumed to understand the meaning of the words it uses and procedures it establishes. *State Bank Commissioner v. Emery*, 19 Kan. App. 2d 1063, 1071, 880 P.2d 783 (1994). And when a statute is clear and unambiguous, we must give effect to the legislature's intent as expressed, rather than determine what the law should or should not be. *Martindale v. Tenny*, 250 Kan. 621, Syl. ¶ 2, 829 P.2d 561 (1992).

Finally, we must decide whether the statutory phrase "substantially alters the facts used as a basis for such requested change of rate" modifies "any amendment" or whether it applies to *any* change regardless of origin. Grammatically, we have no hesitancy in holding "amendment" is the controlling noun which is the subject of the modifying phrase.

An amendment makes a change or modification. Black's Law Dictionary 81 (6th ed. 1990). It suggests an action by one of the parties to change, correct, or revise. No action was taken by KPP, WRI, or the KCC to change or modify the application which would trigger the provisions of 66-117(b).

Further review of the legislative history concerning the evolution of this provision supports our conclusion that an amendment is required.

The phrase "which amendment" contained in the original 1980 legislation, was deleted in 1988, as part of legislation that broadened application of the administrative procedures act. The legislation changed all time limits from being written out, to numerals (*i.e.*, two hundred forty, to 240). See L. 1988, ch. 356, § 225.

When the phrase under scrutiny is read to include "which amendment" the original intent of the legislature is clearer. The 1988 changes were the result of S.B. 334, which made some substantive changes to the administrative procedures act, but overall appears to be a technical bill to "clean up" the statutes by converting to numerals.

Ordinarily, a change in statutory language is presumed to result from a legislative purpose to change its effect. *Schuhs v. Schuhs*, 20 Kan. App. 2d 98, 99, 883 P.2d 1225 (1994). But this presumption is of little force if an amendment is adopted as part of a general, technical revision to a statute. *Board of Education U.S.D. 512 v. Vic Regnier Builders, Inc.*, 231 Kan. 731, 736, 648 P.2d 1143 (1982).

We do not view the deletion of the phrase "which amendment" by the legislature in 1988 as a substantive change intended to modify the meaning of 66-117(b). Rather, the change was merely part of a larger bill seeking to bring consistency to statutes under the administrative procedures act.

At the time the original provisions imposing time limits on the KCC were adopted, the House Ways and Means Committee rejected without discussion a suggestion that would have given the KCC more flexibility in deciding cases under the new time limits. House Ways and Means Committee Minutes, May 2, 1980, p. 2.

Thus, the legislature was intent on forcing the KCC to act within prescribed time limits; if it does not, the proposed changes take effect. In 1980, the legislature recognized the increased burden the time limits would place on KCC staff. Senator Frank Gaines assured members of the House that adequate funds would be provided for the KCC "to adequately and efficiently carry out the provisions of this act" and further "gave his personal assurance that funds would be provided." House Ways and Means Committee Meeting, May 2, 1980, p. 1.

CURB asks us not to abandon or ignore the "thousands" of hours of staff work and the "hundreds of thousands of dollars" of legal and technical analysis expended on the five contracts submitted for approval. But legislative history makes clear that was precisely an anticipated result should the KCC fail to make a final decision within the time limits provided by K.S.A. 1995 Supp. 66-117(b).

The contracts and related requests contained in KPP's consolidated KCC dockets must be deemed approved by operation of law.

Reversed.