(16 P.3d 319)

No. 85,750

No. 85,757

CITIZENS' UTILITY RATEPAYER BOARD, *Petitioner/Appellant*, v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, *Respondent/Appellee*. UTILICORP UNITED INC., d/b/a PEOPLES NATURAL GAS and KANSAS PUBLIC SERVICE, *Cross-petitioner/Appellant*, v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, *Respondent/Appellee*.

Opinion filed December 15, 2000.

*Walter Hendrix*, for petitioner/appellant Citizens' Utility Ratepayer Board.

*Robert A. Fox, Dana Bradbury Green, James D. Oliver*, of Foulston & Siefkin L.L.P., of Topeka, for cross-petitioner/appellant UtiliCorp United Inc., d/b/a Peoples Natural Gas and Kansas Public Service.

*Caroline Ong*, advisory counsel, *Glenda Cafer*, general counsel, and *Anne E. Tymeson*, staff attorney, of the Kansas Corporation Commission, for appellee.

Before KNUDSON, P.J., RULON and GREEN, JJ.

KNUDSON, J.: In this consolidated appeal, the Citizens' Utility Ratepayers Board (CURB) and UtiliCorp United, Inc., (UC) appeal from orders of the Kansas Corporation Commission (Commission) granting UC a rate increase. Appellate jurisdiction is conferred upon this court in K.S.A. 1999 Supp. 66-118a(b).

CURB contends the Commission's final orders are not supported by adequate findings of fact and were entered without appropriate consideration or investigation of UC's flexible rate practices. UC contends the Commission erroneously determined UC's cost of debt to finance its Kansas natural gas public utility divisions.

We affirm the Commission's final orders.

UC is a natural gas public utility engaged in the purchase, transmission, sale, and distribution of natural gas. In October 1999, UC filed a request for a rate increase on behalf of its two Kansas natural gas public utility divisions, Peoples Natural Gas Company (PNG) and Kansas Public Service (KPS). UC requested an increase of $5,884,389 based on a test year ending December 31, 1998. It subsequently revised its request to $6,025,413 because of various inadvertent omissions in the original request.

In addition to CURB, several other parties were allowed to intervene in the proceedings before the Commission, including

Mountain Energy Corporation, the Department of Student Housing at the University of Kansas (KU), Kansas Gas Service Company, and the City of Garden City. CURB is a statutorily authorized volunteer consumer advocacy group which represents the interests of Kansas residential and small commercial ratepayers. See K.S.A. 66-1222. None of the intervenors other than CURB is a party in these appeals.

The Commission staff (Staff) position was that based upon its review of the test year, UC should be allowed a revenue increase of $1,316,701. CURB argued that the Commission should reduce UC's revenue by $3,002,508.

All parties supplied the Commission with direct and rebuttal testimony prior to the rate hearing. At the beginning of the technical hearing, UC and Staff presented a nonunanimous stipulation and settlement agreement (S&A), agreeing to settle most of the issues except for those relating to imputation of revenue relative to UC's discount contracts, cost of UC's debt issues, rate design, as well as aggregations and pooling issues. CURB did not agree to the S&A.

Not until all of the evidence was presented did the Commission decide to adopt the S&A. It also rejected Staff's and CURB's recommendations for revenue imputation as a result of discount contracts, rejected UC's position on the cost of debt, rejected UC's request to increase the charges associated with aggregation pooling charges, and ruled on a number of other issues not before us. UC, CURB, and KU filed timely motions to reconsider. The Commission made modifications in its original order and approved a revenue increase for UC of $4,779,351. Both CURB and UC appeal.

Our general standard of review is stated in K.S.A. 77-621. A party challenging the legality of the Commission's orders bears the burden of proof pursuant to K.S.A. 77-621(a)(1). See *Farmland Industries, Inc. v. Kansas Corporation Comm'n*, 24 Kan. App. 2d 172, 175, 943 P.2d 470, *rev. denied* 263 Kan. 855 (1997).

"If KCC action is constitutionally authorized by statute, it is presumed valid on review unless it is not supported by substantial competent evidence and is so wide of its mark as to be outside the realm of fair debate, or is otherwise unreasonable,

arbitrary, or capricious and prejudices the parties." *Zinke & Trumbo, Ltd. v. Kansas Corporation Comm'n*, 242 Kan. 470, 475, 749 P.2d 21 (1988).

## CURB'S APPEAL

*Commission Adoption of the S&A*

CURB contends the Commission did not make sufficient findings of fact in adopting the nonunanimous S&A. Unquestionably, the Commission may accept a nonunanimous settlement agreement provided an independent finding is made, supported by substantial evidence in the record as a whole, that the settlement will establish just and reasonable rates. *Farmland Industries*, 24 Kan. App. 2d at 186-87.

K.A.R. 82-1-232 provides rules of form and content for orders of the Commission. K.A.R. 82-1-232(a)(3) states that each order of the Commission shall contain "[a] concise and specific statement of the relevant law and basic facts which persuade the commission in arriving at its decision."

"The purpose of findings of fact as mandated by K.A.R. 82-1-232(a)(3) is to facilitate judicial review and to avoid unwarranted judicial intrusion into administrative functions. The Commission must, therefore, express the basic facts upon which it relied with sufficient specificity to convey to the parties, and to the courts, an adequate statement of facts which persuaded the Commission to arrive at its decision. [Citations omitted.]" *Ash Grove Cement Co. v. Kansas Corporation Commission*, 8 Kan. App. 2d 128, 132, 650 P.2d 747 (1982).

The Kansas Supreme Court has construed the Commission's procedural requirements to mean findings need not be rendered in minute detail. However, findings must be specific enough to allow judicial review of the reasonableness of the order. To guard against arbitrary action, conclusions of law must be supported by findings of fact which are in turn supported by evidence in the record. *Zinke & Trumbo*, 242 Kan. at 475.

To examine whether the Commission's action is supported by substantial competent evidence, K.S.A. 77-621(c)(7), the record must contain evidence "which possesses something of substance and relevant consequence, and which furnishes a substantial basis of fact from which the issues tendered can reasonably be resolved." *Southwestern Bell Tel. Co. v. Kansas Corporation Commission*, 4

Kan. App. 2d 44, 46, 602 P.2d 131 (1979), *rev. denied* 227 Kan. 927 (1980).

Where the trial court's (or the Commission's) findings of fact and conclusions of law are inadequate to disclose the controlling facts or the basis of the court's findings, meaningful appellate review is precluded. *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, 378, 855 P.2d 929 (1993).

In its original order, Order No. 8, the Commission made the following findings regarding the S&A:

"6. UtiliCorp and Staff presented witnesses in support of the S&A. [Citation omitted.] The only party opposing the S&A was CURB. [Citations omitted.]

"7. There is a strong policy in the law that settlements are to be encouraged. *Bright v. LSI Corp.*, 254 Kan. 853, 858, 869 P.2d 686 (1994). The Commission has the power to consider non-unanimous settlement agreements and can accept such settlements if it finds the proposed settlement to be reasonable. *Farmland Industries, Inc. v. Kansas Corporation Comm'n*, 24 Kan. App. 2d 172, 186-88, 943 P.2d 470 (1997).

"8. The Commission notes that CURB's statutory obligation is to represent residential and small commercial customers, while the Commission's responsibility is to take a broader view that also considers the interests of any intervenors in the case, all classes of ratepayers, and the stockholders of the utility. [Citation omitted.]

"9. The Commission finds that, on balance, the S&A represents a reasonable settlement of the issues it addresses. The rate options in the S&A are within the litigation positions of Staff and UtiliCorp. [Citations omitted.] Staff indicates that it had considered the possibility that some of its requested adjustments may not have been accepted by the Commission. [Citation omitted.] Parties face uncertainty when litigating issues, and a settlement agreement will reflect acknowledgement of that risk and of the hazards of litigation. See 24 Kan. App. 2d at 194-95. It is evident that the terms of the settlement were zealously negotiated. The fact that the parties could not resolve all issues indicates to the Commission that they were not seeking an agreement at any cost, but were carefully deciding where compromise was possible and where their positions could not be altered. UtiliCorp emphasizes the reasonableness and fairness of the rates agreed to in the S&A when compared to current rates for other natural gas local distribution companies. [Citation omitted.] Based on its familiarity with the industry and the evidence in the record as a whole, the Commission finds that the settlement will establish just and reasonable rates. The Commission also finds that the settlement provides for depreciation and corporate overhead allocation studies which will assist the Commission in monitoring the utility and will benefit future ratepayers. Having considered the terms of the S&A, the Commission concludes that it is reasonable and in the public interest. The May 16, 2000 S&A is accepted and approved."

Upon CURB's petition to reconsider, the Commission in Order No. 9 stated:

"10. CURB argues that the Commission did not make sufficient findings to support its approval of the S&A. The Commission met the applicable standard for approving the S&A by finding that the S&A reasonably resolved the issues it addressed and that the resulting rates would be within a range of reasonableness. As noted in ¶8 of Order No. 8, the Commission's obligation to balance the interests of all affected parties is broader than CURB's responsibility in representing residential and small commercial ratepayers. The Commission's oral ruling on the S&A, made at the conclusion of the hearing, did recognize CURB's evidence, but found that on the whole, given the Commission's responsibility to all parties, the S&A was reasonable and in the public interest."

As noted by CURB, Kansas law does require more than a mere pronouncement a settlement is reasonable. In *Southwestern Bell Tel. Co. v. State Corporation Commission*, 192 Kan. 39, 46-47, 386 P.2d 515 (1963), the Supreme Court stated:

"In a seriously contested rate investigation there must be a determination of (1) a rate base, (2) a fair rate of return, and (3) reasonable operating expense. In determining these factors, there are numerous elements pertaining to each which must be fairly and reasonably determined if a fair return is to result."

While the better practice would have been for the Commission to provide more detailed findings of fact, we believe CURB's contention is without legal merit because the Commission did not accept the S&A until after a full evidentiary hearing on the merits of UC's application for a rate increase. This is not a situation where the stipulation impermissibly shifted the burden of proof or prevented CURB from presenting evidence in opposition to the S&A. The Commission weighed the evidence pro and con that had been presented and only then decided to adopt the S&A as reasonable. We also observe the S&A is limited in scope. It addressed issues of depreciation, corporate overhead allocation, capitalization ratios, sales-based pressures, consolidation of small customer classes, miscellaneous service fees, as well as customer deposits and interest charges. According to the testimony, it also included issues relating to weather normalization calculations and various accounting methodologies. As previously noted, it did not include agreements on revenue imputation, cost of debt, aggregation and pooling is-

sues, or daily imbalance penalties. Finally, our review of Staff Schedule C-1, adopted by implication by the Commission, together with the S&A, demonstrates the Commission did fully consider the essential determinants of (1) a rate base, (2) a fair rate of return, and (3) reasonable operating expense. Thus, after a thorough review of the record, the Commission's findings of fact, including the specifics within the adopted S&A, are supported by substantial competent evidence.

## UC's Discounting Practices

CURB contends the Commission erred in refusing to impute income to offset lost revenues resulting from UC's practice of providing large customers with discount contracts, a practice countenanced by the Commission in a previously approved tariff. This approved tariff authorizes UC to negotiate and provide flexible rates to large customers who might otherwise leave the system. According to Staff, the difference between the revenues UC would have collected during the test year if these discount customers had been charged the full fixed tariff rate is approximately $6 million; coincidentally, this is the amount now sought by UC in its application for a rate increase.

At the underlying rate hearing, CURB argued for a 100% imputation of revenues "lost" as a result of flexible rates; Staff argued for a 50% imputation. Clearly, both CURB and Staff were concerned that residential and small commercial customers should not be burdened with higher rates as a result of UC granting discounts to large customers.

In response, UC argued the Commission had previously approved the flexible tariff and that without discount rates large customers would leave the system. The result would be adverse to the interests of residential and small business customers. Larry Headley, UC's Director of Regulatory Services, testified that Staff's recommendation of a 50-50 split was unreasonable because UC shareholders had shouldered the loss of revenue in the period between the time the discounts were granted and the effective date of the next (this) rate case. Headley explained that as an investor-owned utility, UC was already motivated to maximize its return on in-

vestment with discounts given only when load retention was genuinely threatened. Headley also responded to CURB's alternative argument regarding the absence of proof as to whether UC's best efforts had been utilized to minimize the financial impact of discounts. Headley contended that because the discount contracts were pursuant to a previously approved flexible tariff there is a presumption that they are reasonable. Therefore, according to Headley, the burden should be on CURB, not UC, to present evidence that the discounts given were not prudent.

In its initial order the Commission rejected Staff's and CURB's recommendations for revenue imputation. The Commission found imputation arguments must be based on prudence and particular facts of each individual discount service contract. In its order on reconsideration, the Commission stated that at the time UC entered into the discount agreements, they were either approved as special contracts or were in compliance with approved tariffs. It went on to say that *the time to challenge the flexible rate tariffs and special contracts was when they were initially filed for review*. The Commission noted that the rates charged under these agreements are prima facia reasonable and, pursuant to K.S.A. 66-115, the party challenging the prudence of such agreements bears the burden of overcoming the presumption of reasonableness. The Commission went on to note that CURB had not provided sufficient evidence that any of the agreements were imprudent.

K.S.A. 66-115 provides:

"Except as otherwise provided in K.S.A. 66-117 and amendments thereto, all orders, regulations, practices, services, rates, fares, charges, classifications, tolls, and joint rates fixed by the commission shall be in force and effect 30 days after service, and shall be prima facie reasonable unless, or until, changed or modified by the commission or in pursuance of proceedings instituted in court as provided in this act."

It is a well-established principle that all rates fixed by the Commission are prima facie reasonable unless or until changed or modified by the Commission or by court order. *Southwestern Bell Tel Co.*, 4 Kan. App. 2d at 47. However, the presumption of validity which attaches is measured by the conditions then existing. This would not preclude the Commission from considering changed

conditions under an application for a rate increase. *Midwest Gas Users Ass'n v. Kansas Corporation Commission*, 5 Kan. App. 2d 653, 661, 623 P.2d 924, *rev. denied* 229 Kan. 670 (1981).

CURB contends UC failed to provide documents and corporate records to support CURB's claim of imprudence. The Commission noted CURB had made its discovery request less than 2 weeks prior to the hearing. The Commission ruled CURB should have filed a motion to compel production if it was dissatisfied with UC's initial response.

When a utility seeks an increase in its rates, it bears the burden to show such a change is necessary. *Kansas-Nebraska Natural Gas Co. v. State Corporation Commission*, 217 Kan. 604, 615, 538 P.2d 702 (1975). However, once a tariff is established, it carries the presumption that it is just and reasonable. K.S.A. 1999 Supp. 66-117. It would appear CURB should have the burden to show that the discount agreements were not reasonable to justify any imputation of income to UC.

CURB was apparently acting under the assumption that UC would have to provide such data with its rate request. When it determined that such data was not provided and that the Commission was not requiring the data be provided in the application, CURB made a request of UC for the data. UC filed its request for rate increase in October 1999. However, CURB did not ask for any documentation supporting the prudence of the discount contracts until May 4, 2000, or approximately 12 days before the start of the public hearings. CURB apparently did not ask for additional information after UC responded to CURB's request.

David Springe, an economist, testifying on behalf of CURB, stated he did submit a lengthy data request for analysis on the discount contracts but the responses were not adequate. On cross-examination, he testified that CURB's position was the captive rate-payers should not pay for any of UC foregone revenue. Further, since CURB's position was that UC should have to prove the contracts were prudent, Springe believed UC's inadequate response to the data request strengthened CURB's case that UC had not done any analysis prior to granting the discounts.

The Commission found that the flexible tariffs were presumptively reasonable and CURB had not carried its burden to come forward with evidence to show they were not. This is a negative finding. " '[A] negative finding that a party did not carry its requisite burden of proof will not be disturbed on appeal absent proof of an arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion, or prejudice.' " *Kansas Pipeline Partnership v. Kansas Corporation Comm'n*, 24 Kan. App. 2d 42, 52, 941 P.2d 390, *rev. denied* 262 Kan. 961 (1997) (quoting *Beech Aircraft Corp. v. Kansas Human Rights Comm'n*, 254 Kan. 270, 275, 864 P.2d 1148 [1993]).

CURB erroneously assumed that UC would be required to present the data ultimately requested as part of its application for a rate increase. When CURB did request the data and determined UC's production was inadequate, CURB's remedy was to file a motion to compel. Although the Commission could have ordered UC to provide the data regarding the discount contracts upon the untimely and unorthodox request of CURB, it was certainly not required to do so. The Commission correctly placed the burden of proof upon CURB and did not abuse its discretion in denying CURB's untimely request for further production of documents.

CURB also claims the Commission failed its regulatory oversight responsibilities by not reviewing the discount contracts entered into by UC with certain customers under the previously approved flexible rate tariff.

CURB cites *Colorado-Ute Elec. v. Public Utilities*, 760 P.2d 627 (Colo. 1988), for the position that the Commission had an affirmative duty to investigate UC's contracts. In that case, the Colorado Supreme Court held that the Public Utilities Commission (PUC) had the authority to investigate and hold hearings concerning utility rates. 760 P.2d at 636. In construing the Colorado statutes, the court held that "under certain circumstances the Commission is required to investigate a tariff change." 760 P.2d at 638. The language CURB wishes this court to adopt comes from that portion of the decision dealing with allocation of $24 million of electric generation fixed costs (demand costs) to the energy component of the demand-energy rate. 760 P.2d at 645. The Colorado

Supreme Court affirmed the district court's ruling that there was insufficient evidence to support such a shift. 760 P.2d at 647. The court then stated:

"We have held that where an order of the Commission is issued solely as a matter of administrative convenience, or in the absence of sufficient investigation into pertinent considerations, the order is arbitrary, capricious, and invalid. *City of Montrose v. Public Utilities Comm'n*, 197 Colo. 119, 123, 590 P.2d 502, 505-06 (1979) (commission's order arbitrary and capricious, where no study commissioned regarding cost-of-service breakdown, although study was feasible, and no discussion in commission's order of disparate service cost; therefore, order issued solely as a matter of administrative convenience). Further, orders of the Commission which are arbitrary and capricious must be set aside. *Peoples Natural Gas Div. v. Public Utilities Comm'n*, 698 P.2d 255, 265 (Colo. 1985). . . .

"The same factors which cause us to conclude that the Commission's conclusions are not supported by substantial evidence, also lead us to find this portion of the Commission's decision arbitrary and capricious. The proposed shift to demand costs represents little more than an ad hoc and unsupported analytical shortcut invented and adopted simply because the necessary rate design studies had not been performed by the Commission staff. The evidence clearly shows that such a study was entirely feasible, had the staff collected the necessary data. The district court, therefore, was fully justified in holding that this portion of the Commission's order was arbitrary and capricious." 760 P.2d 648.

A close reading of the facts of *Colorado-Ute Elec.* convinces us the Colorado PUC adopted a method of classifying certain demand costs that was contrary to its own cost-of-service study. The only testimony in the record indicated the rate eventually adopted could not be supported, either in outside literature or by Staff's own studies. In fact, the witness testified he was unaware of any other case where the Commission had proposed such an approach.

In the instant case, the Commission did consider whether revenue should be imputed to make up for revenue lost as a result of discounting in prior rate cases. Thus, unlike the case in *Colorado-Ute Elec.*, this was not a new or unstudied procedure. Also, this case is different in that UC's discounts were granted pursuant to an existing Commission-approved tariff. There was no such prior approval in the Colorado case.

"The KCC is the state regulatory agency with the power and authority to supervise and control intrastate natural gas public utilities doing business in Kansas. See K.S.A. 66-101 *et seq.*" *Kansas*

*Pipeline Partnership v. Kansas Corporation Comm'n,* 22 Kan. App. 2d 410, 412, 916 P.2d 76, *rev. denied* 260 Kan. 994 (1996). K.S.A. 1999 Supp. 66-129 gives the Commission the authority to examine, audit, and inspect any and all books, accounts, papers, records, property, and memoranda kept by public utilities and common carriers. Although not cited by either party, K.S.A. 1999 Supp. 66-1,204 provides:

> "The commission, upon its own initiative, may investigate all schedules of rates and rules and regulations of natural gas public utilities. If after investigation and hearing the commission finds that such rates or rules and regulations are unjust, unreasonable, unjustly discriminatory or unduly preferential, the commission shall have the power to establish and order substituted therefor such rates and such rules and regulations as are just and reasonable.
>
> "If after investigation and hearing it is found that any regulation, measurement, practice, act or service complained of is unjust, unreasonable, unreasonably inefficient or insufficient, unduly preferential, unjustly discriminatory, or otherwise in violation of this act or of the orders of the commission, or if it is found that any service is inadequate or that any reasonable service cannot be obtained, the commission may substitute therefor such other regulations, measurements, practices, service or acts, and make such order respecting any such changes in such regulations, measurements, practices, service or acts as are just and reasonable. When, in the judgment of the commission, public necessity and convenience require, the commission may establish just and reasonable concentration or other special rates, charges or privileges, but all such rates, charges and privileges shall be open to all users of a like kind of service under similar circumstances and conditions. Hearings shall be conducted in accordance with the provisions of the Kansas administrative procedure act, unless, in the case of a general investigation, for good cause, the commission orders otherwise."

See also K.S.A 66-1,201 (Commission is empowered to do all things necessary and convenient to supervise and control the natural gas public utilities).

Authorities have observed that a public service commission, like the Kansas Corporation Commission, "has no inherent power; all its power and jurisdiction, and the nature and extent of the same, must be found within the statutory or constitutional provisions creating it." 64 Am. Jur. 2d, Public Utilities 232, p. 739. However, these provisions should not be construed so narrowly as to defeat their main purpose, but should be liberally construed to include every power fairly to be implied by the language used or necessary

to enable the Commission to exercise the powers expressly granted. *Street Lighting Co. v. Utilities Commission*, 101 Kan. 774, 777, 169 Pac. 205 (1917). In *Pelican Transfer & Storage v. Kansas Corporation Commission*, 195 Kan. 76, 79, 402 P.2d 762 (1965), the court, interpreting K.S.A. 66-101, which at the time applied to common carriers as well as public utilities, stated that the Commission had full power and authority to regulate common carriers (and presumably utilities) and could do all things necessary and convenient in the exercise of its power. See *Grindsted Products, Inc. v. Kansas City Power & Light Co.*, 21 Kan. App. 2d 435, 443, 901 P.2d 20 (1995). Kansas courts have also recognized that matters concerning public utilities are highly complex, and the Commission is recognized to have vast expertise and discretion in regulating utilities. *Kansas Gas & Electric Co. v. Kansas Corporation Comm'n*, 239 Kan. 483, 495, 720 P.2d 1063 (1986).

Thus, the Commission does have the authority to examine the discount contracts established under the prior tariff and issue such orders as necessary. The question remains, does the Commission have a *duty* to investigate the discount agreements?

This is a question of statutory interpretation and, therefore, a question of law. Our standard of review is unlimited. *Hamilton v. State Farm Fire & Cas. Co.* 263 Kan. 875, 879, 953 P.2d 1027 (1998).

The long-standing rule in this jurisdiction is that when a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed rather than determine what the law should or should not be. See *Ussery v. Kansas Dept. of SRS*, 258 Kan. 187, Syl. ¶ 6, 899 P.2d 461 (1995). The plain language of the statute provides that the Commission *may* investigate. Thus, there is no statutory duty, nor do the cases cite any common law duty, that would require the Commission to examine UC discount contracts, absent evidence indicating those contracts were in some way violative of the provisions of K.S.A. 66-101 *et seq.* The only argument left for CURB, under K.S.A. 77-621, is that the Commission's failure to investigate was unreasonable, arbitrary, or capricious.

CURB contends that UC is shifting revenue responsibility to its captive customers at the same time it resupplies the discount customers from its unregulated affiliate. This allows the captive customers to pick up more of the regulated costs of the local distribution company's (LDC) system. CURB does no more than to assert this is part of UC's marketing strategy as an energy merchant, without citation to any portion of the record to support its claim or even explain how this process works.

The record does show that one of UC's corporate goals is to become a leading energy merchant. Aquila Energy Corporation is UC's wholesale merchant within the UC corporation. It also owns Energy One Ventures. Jon Empson, UC's senior vice president for regulatory, legislative, and environmental services, testified that UC's goal as an energy merchant is to be involved in wholesale transactions where it would provide services to LDC's and large industrial customers and help them manage their energy needs.

We are not insensitive to the argument made by CURB. It is of concern to this court that the Commission has not investigated the economic viability of the flexible rate structure it previously approved. However, based upon our limited standard of review, we cannot say the Commission has acted arbitrarily or capriciously for failure to investigate. CURB has failed to provide any authority that the Commission had a mandatory duty to audit discount contracts on an ongoing basis for fairness and reasonableness. Additionally, CURB's assertions, without citation to the record, that UC is shifting the cost of the LDC to the captive ratepayers in order to benefit its nonregulated affiliates must fail.

CURB next contends the Commission failed to adhere to its ruling in the so-called 420 docket. At or around the same time the instant case was being heard, the Commission issued its order in *In the Matter of the Application of Kansas Gas Service Company, a Division of ONEOK, Inc., for Commission Determination of the Rate Treatment of Discounted Service Agreements Entered Into to Meet Competitive Alternatives*, Docket No. 00-KGSG-420-RTS. Oral arguments were held on the 420 docket on April 12, 2000, and the initial order was issued April 19, 2000.

The purpose of the 420 docket was specifically to examine how the Commission would treat special discounts granted to certain customers when they threatened to leave the system. Two issues were presented. First, how could the Commission ensure that discounts given under the flexible tariffs were fair and reasonable? Second, should the Commission impute any revenue to the utility in subsequent rate hearings to offset the revenue lost as a result of discounting?

In its order in the 420 docket, the Commission ruled that it would not automatically impute any percentage of income to a utility as a result of special contracts or discount contracts that were entered into to meet competitive demands. The Commission stated that *in future rate cases* those utilities entering into discounts under flexible tariffs must have available all documentation and information relating to the offering of the discount and the level of any discount. Such data would be promptly provided pursuant to any discovery request. The order stated that it would not rule out that if a significant portion of the utility's load was subject to a discount rate, even with prudent action by the utility, the utility's revenue requirement could be affected. It would be the utility's burden to make a prima facia showing that the discount service agreements were reasonable. Thus, the Commission inferentially found discounting agreements would be viewed on a case-by-case basis.

CURB contends the Commission's decision, finding the order in the 420 docket had no application in this case, was inconsistent with its finding that "consistent" with the 420 docket, automatic revenue imputation would not be considered. According to CURB, the Commission placed the burden on CURB to make a showing that UC's discount agreements were not reasonable, when under the 420 order, the utility seeking the rate increase had the initial burden. The Commission accomplished this by finding the 420 docket had no application in this case. CURB's argument is that the Commission found the 420 order not to be applicable when it benefitted CURB's position, but applicable when it was of benefit to UC.

The parties do not provide us with a standard of review upon this issue. Whether the Commission could, in the 420 docket, find

that its order only applied to rate cases filed after the date of that order, we believe to be a question of abuse of discretion. Neither party has provided citations of authority or persuasive argument that the Commission is precluded from giving its order prospective effect only.

In its Order No. 8 in this case, the Commission noted that the timing of the 420 docket made it difficult to formulate the positions of the parties in this case. However, consistent with the decision in the 420 docket, the Commission would not consider imputation of revenue to automatically be applied on a percentage basis to any discount contracts. It found that imputation arguments must be based on prudence and must be based on the particular facts of each discount agreement. In Order No. 9, it went on to rule that when UC's discounts were entered into they were either special contracts or in compliance with Commission approved tariffs. By statute, the rates charged under these agreements were prima facie reasonable. The time to challenge any special contracts was when they were reviewed by the Commission and, thus, CURB's challenge was untimely. As to the discount contracts, the Commission found it would be inconsistent with legal principles to force UC to comply with the 420 orders at this time. Under the applicable tariffs, UC was not obligated to defend each agreement, and, thus, it was CURB's burden to overcome the presumption of reasonableness. It went on to note that the manner of reviewing discount agreements as provided in the 420 docket was a change from prior practice, and it could not apply those standards retroactively.

K.S.A. 66-1,207, which states that all grants of power and authority and jurisdiction herein made to the Commission shall be liberally construed, and all incidental powers necessary to carry into effect the provisions of the Natural Gas Public Utilities Act, K.S.A. 66-1,200 *et seq.*, are specifically conferred upon the Commission, appears to authorize the Commission to make its 420 order prospective only. We conclude the Commission's ruling was not arbitrary or capricious and was within its statutory authority.

### UTILICORP'S APPEAL

UC contends the Commission erred in rejecting its proposed

cost of debt. It argues that the Commission's final orders were not based upon substantial competent evidence, were an arbitrary departure from precedent, and arbitrarily and capriciously included certain foreign debt costs which had no relationship to Kansas.

John Dunn, an economist who testified on behalf of UC, testified that UC supplied long-term debt to divisions based on need and request and that debt is assigned to the division for the life of the issue. Once the assignment is made, that long-term debt becomes part of the division's permanent capital and is not reallocated or used in financing other divisions unless and until the division no longer needs the debt. It is undisputed PNG and KPS receive all of their capital from UC.

Dunn testified this method was more accurate than the consolidated approach because the consolidated approach bears no substantial relationship to any of the particular individual divisions of the utility. He also stated that the individual division capitalization concept is the generally accepted practice in financial markets, banking, and academia and that using the consolidated approach would call into question the management and operating abilities of the company.

According to Dunn, in order for the consolidated capital structure to have practical merit, all the dollars reflected in the consolidated capital structure would have to flow into UC's treasury and be available to finance any of UC's activities. Dunn testified that, in reality, not all the dollars reflected in the consolidated capital structure flow into UC's coffers. For example, he described how Aquila was not wholly owned by UC and, by Securities and Exchange Commission rules, the capital of Aquila cannot be used by UC as it sees fit. Also, UC is carrying capital on its books which reflects debt that was used to finance activities in New Zealand, Australia, and Canada, and, by the terms of the debt instruments or by statutes, the proceeds could not be used anywhere else. According to Dunn, the result is that this capital is not available to finance any operations in Kansas or anywhere else in the United States. Therefore, he asserted that the foreign debt, the debt issued by other entities that UC guaranteed, and debt issued by entities which UC did not guarantee, should not be included in UC's cost

of debt for this case. In his opinion, the use of foreign debt in UC's Kansas cost of capital could subject Kansas ratepayers to adverse fluctuations in foreign debt markets. The total long-term debt on UC's books as of December 31, 1998, was $1,624,600,000. Of that amount, $596,400,000 was tied up in international issues.

Finally, according to Dunn, the use of division allocation provides management and regulators a historical tool for judging performance. He stated such an allocation holds the cost of debt and equity for each division to a level that is related to that division's activities and not related to the overall activities of UC, thus, giving UC's divisions the lowest possible cost of capital. At the technical hearing, Dunn testified that UC had used this debt allocation method since 1986 when UC bought PNG. However, on cross-examination, Dunn conceded debt allocated to PNG is not legally restricted to finance Kansas operations. He also testified PNG's cost of long-term debt at the end of the test year was 8.63%.

Andrea Crane, vice president of The Columbia Group, Inc., testified on behalf of CURB. Columbia is a consulting firm specializing in utility regulation. She testified that all of the capital used in the company's gas operations is received from UC. UC obtains the debt on the open market and allocates it among the subsidiaries and divisions. In allocating the capital, UC first determines the targeted capital structure for each business entity and then allocates the available capital accordingly. According to Crane, this methodology results in a somewhat arbitrary assignment of certain debt issuances to each business unit. Therefore, using this methodology, the cost of debt for the regulated utility is affected by the manner in which UC assigns the debt. In her opinion, this procedure did not result in a cost of debt that was reflective of the underlying utility operations, the industry, or the underlying capital costs of the public utility. Since UC was the source of all the debt, she recommended using the overall UC embedded (consolidated) cost of debt.

Adam Gatewood, a senior financial analyst with the Commission, testified there was no evidence that the cashflow from PNG operations is dedicated solely to the specific debt issues allocated to PNG by UC. Rather, as a division, cashflow from PNG returns to

UC to cover UC's obligations. He recommended allowing UC a cost of debt of 7.83%.

Gatewood, when questioned about payments from UC's foreign debt not flowing back to the UC coffers in the United States, pointed out that similarly, no UC funds would need to be supplied from United States operations to service that debt. Thus, the debt was a benefit to the total UC operation, both foreign and domestic. The combined interest rate for the foreign debt was 7.28%. According to Gatewood, given that UC is continually retiring and reissuing debt, without any formal ties to Kansas operations, it is very subjective of UC to assign any specific debt obligations to Kansas.

UC has the burden to prove the invalidity of the Commission's determination. See K.S.A. 77-621(a)(1). Rates fixed by the Commission are prima facie reasonable until changed or modified by the Commission or by court order, and the utility has the burden of proving the reasonableness of any proposed change in arriving at an increased rate. *Southwestern Bell Tel. Co.*, 4 Kan. App. 2d 44, Syl. ¶ 4.

The Commission rejected UC's division allocation methodology finding that PNG does not issue its own debt, but that PNG receives all its debt via UC. It also found the manner in which UC allocates debt to PNG is somewhat arbitrary and, therefore, rejected UC's methodology in favor of Staff's proposal to use UC's total cost of embedded cost of debt. Similar to its finding that CURB did not prove any discount agreements unreasonable, the Commission essentially found that UC did not sustain its burden to prove that its position was sound. This was a negative finding. Absent an arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion, or prejudice, this court will not disturb the Commission's order. *Kansas Pipeline Partnership*, 24 Kan. App. 2d at 52.

The Commission heard testimony from witnesses from UC, CURB, and Staff. No one disputed UC's evidence concerning the various classes or groups of debt carried on UC's books. UC admitted the debt allocated under its methodology was not legally restricted to Kansas operations and, other than UC's decision, bore

no relationship to Kansas operations. All debt utilized by PNG and KPS was obtained through UC, which procured the debt on the open market without reference to Kansas activities. In the final analysis, there were two or three valid methods for determining UC's cost of debt in this hearing, and the Commission, after hearing all the evidence and opinion testimony, chose the method it believed most appropriate.

UC also argues the Commission's action was arbitrary and capricious because the agency ignored its own established policy. According to UC, the Commission has consistently, in prior rate cases, held that the Kansas cost of debt as computed by UC was relevant for determining the appropriate rate of return for providing gas to Kansas customers. This argument was not presented in UC's motion to reconsider and is, therefore, not subject to consideration upon appeal. "Any ground not set forth in the application for rehearing cannot be relied upon in judicial review proceedings." *Peoples Natural Gas v. Kansas Corporation Commission*, 7 Kan. App. 2d 519, 526, 644 P.2d 999, *rev. denied* 231 Kan. 801 (1982).

Even if we were to consider UC's claim, there is nothing in the record on appeal to substantiate the claim. John Dunn did testify that UC's divisional methodology had been reviewed in prior rate cases before various state commissions including Kansas. He went on to say that it had been adopted in most of the states. This falls far short of evidence that the Commission had specifically approved of the divisional appropriation method in prior Kansas cases.

Finally, UC claims that the Commission erred in ruling the cost of debt in Kansas was irrelevant. The record does not support this claim. Further, UC presented no evidence on what the cost of debt was in Kansas. It only presented evidence of what the cost of debt was considering those debt issues UC allocated to Kansas. There was no evidence presented concerning what a similarly situated Kansas utility could obtain in the debt market. Thus, this issue fails.

The sum total of UC's claims are that the Commission disregarded undisputed evidence and that its decision was arbitrary and capricious. A review of the record does not support this assertion.

The Commission considered all of the evidence presented and found UC's proposed allocation wanting for purposes of establishing fair and reasonable rates within Kansas. We conclude the Commission's decision was based upon substantial competent evidence and was not arbitrary or capricious.

## CONCLUSION

For all of the above stated reasons, we conclude the relief sought by CURB and UC should be denied. The final orders of the Commission are affirmed.

Affirmed.